In re Robert August POMMERER and Shirley Georgeann Pommerer, Debtors.

THORP CREDIT AND THRIFT COMPANY, Plaintiff,

v.

Robert August POMMERER and Shirley Georgeann Pommerer, Defendants.

Bankruptcy No. 5–80–203.
Adv. No. 80–0043.

United States Bankruptcy Court,
D. Minnesota,
Fifth Division.

May 7, 1981.

D. H. Seel, Richfield, Minn., for plaintiff.

Mary L. Everett, Little Falls, Minn., for defendants.

## MEMORANDUM DECISION AND ORDER FOR JUDGMENT

PATRICK J. McNULTY, Bankruptcy Judge.

The above-titled case came regularly on for trial before the undersigned United States Bankruptcy Judge, pursuant to notice. The Complaint seeks an Order lifting the automatic stay of proceedings provided by the Code, *Title 11 U.S.C. § 362*, to enable plaintiff to proceed pursuant to the provisions of the Uniform Commercial Code to realize upon personal property in which it claims a security interest; seeks a determination that the defendants' obligation to plaintiff is non-dischargeable; and seeks judgment in the amount of $23,032.67. Defendants interposed an Answer, in the nature of a general denial, and a Counterclaim in which they seek an Order voiding plaintiff's claim to a security interest pursuant to Title 11 U.S.C. § 522(f)(2)(B). By Reply to this Counterclaim, plaintiff has placed in issue the constitutionality of § 522 of the Code. Pursuant to Title 28 U.S.C. § 2403(a) and Rule 24(c), *F.R.C.P.*, the Court certified the matter to the Attorney General of the United States, and permitted intervention for argument on the question of the constitutionality of the statute. A brief has been filed by the Director and Counsel for the Executive Officer of the United States Trustee, Department of Justice, on behalf of the government.

NOW, upon all of the file, record and proceedings, the following Memorandum Decision, incorporating Findings of Fact and Conclusions of Law, and Order is made and entered and is deemed to comply with the form requirements of the Rules of Bankruptcy Procedure.

### I.

Robert August Pommerer and Shirley Georgeann Pommerer, husband and wife, filed a petition for relief under Chapt. 7 of the Code on August 29, 1980. For much of his adult life, Pommerer has either worked on a farm or operated a farm, mostly in conjunction with other employment. From 1951 to 1954, he worked in the iron mines, in 1956 and 1957 he worked on a farm in Wisconsin, and from 1957 to 1970 he was employed as a truck driver. In 1971, he started to farm on his own, and in 1975 entered into a Contract for Deed for the purchase of a larger farm. Throughout this period he maintained employment as a part-time truck driver. The defendants first borrowed money from plaintiff in July of 1976. On or about April 4, 1979, defendants made application for a loan to consolidate debts and to install a well and septic system on the farm. The balance which they owed the plaintiff at that time was about $2,800.00. During the initial conversation, Pommerer was informed that plaintiff would require a lien upon cattle and equipment as security for this loan. Pommerer informed plaintiff that he had, in addition

to farm machinery, 51 cows, 3 heifers and a steer. On or about April 9, 1979 representatives of plaintiff went to the Pommerer farm and made a rather detailed inventory and appraisal of the livestock and farm machinery. The appraisal indicated that loan value of the livestock and chattels was $33,950.00. This was somewhat less than their market value. After a credit check, and a lien search, a $34,892.29 loan was approved, and arrangements made to pay off an existing lien on the cattle from the proceeds. On April 17, 1979, defendants executed the necessary note and security agreements. The security agreement granted plaintiff lien rights in all of the farm machinery which plaintiff had viewed on the Pommerer farm, and the 55 head of cattle. In addition, defendants executed a security agreement on proceeds from the future sale of milk, and assigned these proceeds to plaintiff. The security agreements were properly filed and the security interests perfected.

Unbeknownst to plaintiff, 21 head of livestock on the farm were only leased and were not owned by defendants. This lease agreement had been entered into in January 1979, and provided for monthly rental payments, which debtors maintained current, and provided that defendants could purchase the cattle for $15,408.75 after one year.

In June, 1979, defendants wanted to purchase additional farm machinery, and again applied to plaintiff for a loan. This transaction resulted in plaintiff obtaining a perfected purchase money security interest in a haybine, a corn planter and a corn sprayer.

In mid-Summer 1979, Pommerer sold two of the cows which he owned, in the fall of 1979 he sold twelve more, and thereafter he sold another twelve. During this period he also butchered two head for home consumption. Pommerer did not inform plaintiff of these actions and did not apply the sale proceeds to payment of the loan.

The Pommerers were unable to make the spring payment on the contract for deed on the farm, and in about June 1980, it was canceled. Defendants experienced trouble in making payments on the loans during the Summer of 1980, and finally decided to liquidate their assets through an auction. In reviewing the list of property advertised to be sold at the auction, plaintiff discovered that it included only 26 head of cattle. On August 28, 1980, one of plaintiff's representatives went to the farm to investigate this apparent discrepancy, and, for the first time, discovered that 28 head of cattle upon which the plaintiff had a lien were missing, and that 21 head of the remaining cattle were only leased to Pommerer. The auction was canceled, and four days later defendants filed their petition for debtor's relief. Thereafter, plaintiff arranged to take possession of the remaining five head upon which it had a lien, sold them for $3,044.08, and credited defendants' account with this amount. The debtors have claimed federal exemptions, and have included the farm machinery and equipment which is in their possession. Since losing the farm, defendants have lived in Burtrum, Minnesota where defendant is employed as a carpenter. Debtors express an intention to resume farming as soon as circumstances permit.

## II.

█ Plaintiff premises its cause of action upon Title 11 U.S.C. § 523(a), which where, pertinent, is as follows:

"A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

This is basically the pre-Code provision contained in the Bankruptcy Act. The additional specification of "actual fraud" adds nothing which had not been judicially impressed upon Sec. 17 of the Act. False pretenses, false representations and actual fraud are virtually indistinguishable.

Fraud has its derivation in the common law action for deceit, but has grown to include all intentional acts or omissions involving artifice which constitute a breach of a legal duty causing injury to another. The elements are, generally,

a) A false representation pertaining to a past or present fact.

b) Knowledge that the representation is false or the assertion of a matter as fact without knowledge of its truth or falsity.

c) An intention to induce the other person to act upon the representation.

d) Reliance upon the misrepresentation.

e) Resultant damage. (*Cf., Rudstrom v. Sheridan*, (1913) 122 Minn. 262, 142 N.W. 313.)

Actual fraud involves moral turpitude and does not include fraud implied in law which may exist without imputation of bad faith or intentional wrong. *Cf., Neal v. Clark*, (1887) 95 U.S. 704, 24 L.Ed. 586; *In re Taylor*, (9th C.A. 1975) 514 F.2d 1370. Regardless of whether the malfeasance is characterized as a false pretense, a false representation or actual fraud, it connotes deceit, artifice or trick which involves a direct and active operation of intellect which is designed to mislead. The essence of the action is deception, the misrepresentation, therefore, need not be expressed in words. *Marino v. Northern P. Ry. Co.*, (1937) 199 Minn. 369, 272 N.W. 267. Concealment of a fact can be as effective a misrepresentation as an outright lie, *see, In re Schnabel*, (Minn.1945) 61 F.Supp. 386, and an actionable misrepresentation can be implied from conduct. *Stern v. National City Co.*, (Minn.1938) 25 F.Supp. 948, aff'd. (8th C.A. 1939) 110 F.2d 601. The action in this Court sounds in tort, not in contract, and the plaintiff's burden of proof of each element of the cause of action is measured by the federal standard of clear and convincing evidence. *United States v. Societe Anonyme des Anciens Establissements Cail*, (1911) 224 U.S. 309, 32 S.Ct. 479, 56 L.Ed. 778; *Southern Development Co. v. Silva*, (1887) 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678; *Oriel v. Russell*, (1928) 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419; *Brown v. Buchan-an*, (Va.1975) 419 F.Supp. 199; *In re Huff*, (Bkrtcy.Utah 1979) 1 B.R. 354, 1 CBC 2nd 171.

Identifying the facts supporting plaintiff's cause of action, and applying the federal standard of proof to the operative elements of fraud, is not too difficult in this case. The gist of plaintiff's case is that it was induced to enter into the loan in May of 1979 in reliance upon Pommerer's tacit representation that he could, and was, giving plaintiff a security interest in all 55 head of cattle as collateral for repayment of the loan. Undoubtedly, plaintiff was led to believe that Pommerer owned 55 head of cattle which he was free to pledge. Plaintiff made a reasonably thorough effort to ascertain whether or not there were liens filed on the cattle, but, unfortunately, the title to cattle is not available from a public registry. Defendant seeks to absolve himself of any culpability by asserting that he did not tell plaintiff that he "owned" 55 head of cattle, but merely that he "had 55 cattle". This Court is not impressed with sophistry or weaseling. Defendant was not totally uninitiated in the world of commercial financing. He possessed a reasonably acute and sophisticated familiarity with the intricacies of loan transactions. Whether or not he actually and positively affirmed ownership in all of the cattle at the initial interview, or at the subsequent visit to his farm by plaintiff's representatives, pales into insignificance in the light of his ensuing conduct. Execution of the security agreement was a positive act. It was a positive assertion, both implied and express, of a right to grant the plaintiff a security interest in all the cattle. Remaining silent was concealment of a material fact, and was no less an effective misrepresentation than a blatant claim of ownership. Pommerer knew that plaintiff was relying upon the lien he presumed to grant, and he knew that his chances of obtaining a loan would be diminished, if not demolished, if plaintiff was informed that he owned cattle worth only approximately $12,000.00 instead of approximately $20,000.00. Pommerer stood mute, with an intent that plaintiff proceed under a misconception, and purposefully to

induce plaintiff to approve and grant the loan. A subjective intent is virtually incapable of direct proof. it must be inferred from all circumstances surrounding the transaction, and can be found where a person makes representations which any reasonable person would know would induce another to act. *Carini v. Matera*, (7th C.A. 1979) 592 F.2d 378; *In re Retzlaff*, (Bkrtcy. Mich.1979) 1 B.R. 628, C.C.H. Bankr.L.R., para 67, 284. The Court has drawn the only reasonable inference which Pommerer's conduct supports. In reliance upon a belief that the loan was reasonably well secured, plaintiff advanced Pommerer $31,462.56 and satisfied the balance on the existing loan.

The Court concludes that plaintiff has sustained its burden of proving all elements necessary to establish that defendant's obligation to plaintiff is non-dischargeable.

■ The damage which plaintiff suffered by virtue of defendants' fraud is measured by the new money advanced in reliance upon the misrepresentation. This amount, however, has since been reduced to $20,-257.79. Plaintiff is entitled to judgment in that amount.

It should be noted that most of the acts and transactions pertinent to this case were performed by or at the direct behest of Mr. Pommerer. The debtors do not contend that a husband-wife agency relationship did not exist. The Court has, therefore, attributed all favorable and unfavorable conduct of Pommerer to both debtors on agency principles.

### III.

Secondly, plaintiff premises an action on Title 11 U.S.C. § 523(a)(6) which excepts from discharge a debt:

"for willful and malicious injury by the debtor to another entity or to the property of another entity; ..."

The adoption of the Code eliminated the specific reference to willful and malicious conversion of property of another which was contained in Section 17(a)(2) of the Bankruptcy Act. However, that Congress intended to include that type of conversion in § 523(a)(6) seems to be generally recognized. 124 Cong.Rec.H. 11,095–6 (Sept. 28, 1978); S. 17,412–13 (Oct. 6, 1978); *In re Graham* (Bkrtcy.Nev.1980) 7 B.R. 5, 6 BCD 539, 2 C.B.C. 2nd 695. Conversion has been variously defined, but implicit in each definition is the wrongful assumption of dominion over personal property by one person to the exclusion of possession by the owner and in repudiation of the owner's rights.

■ To establish that an obligation arising from a conversion is non-dischargeable under this subsection, the plaintiff must prove a conversion which was both willful and malicious. A willful conversion is one which is deliberate and intentional. *Bennett v. W. T. Grant Company*, (4th C.A. 1973) 481 F.2d 664. The rule of *Tinker v. Colwell*, (1902) 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754, which included in the standard a "reckless disregard" for the rights of another, is now in disrepute. A malicious conversion envisions a tort with aggravating features which warrant a deduction that the act transcends a minimal or technical wrongdoing and evinces a willingness to voluntarily inflict injury. *Cf., Rees v. Jensen*, (9th C.A. 1948) 170 F.2d 348; *Bennett v. W. T. Grant Company, supra*. This is a factual determination which can only be made on a case to case basis. *U.S.F. & G. Co. v. Tanner*, (Colo.1968) 279 F.Supp. 396; *Prudential Finance Plan v. Necaise*, (La. App.1966) 192 So.2d 868.

■ Defendant testified that one injured cow was butchered and consumed by his family. Evidently this was the predictable fate of the steer. Three cows were sold when they became unfit for dairy purposes. It is difficult for the Court to find the necessary elements of maliciousness in these technical conversions, and it is specifically found that the obligation arising from the conversion of these five head of cattle is dischargeable.

Defendant commenced selling the other cattle upon which plaintiff held liens within two or three months after the liens were granted. At the outset, the Court admits that it has difficulty with defendants' arith-

metic. The plaintiff's inventory, and defendants' testimony, established that defendant owned 34 head and leased 21 head. Defendant testified that he sold 26, ate 2 and that plaintiff repossessed 5 of the cattle which he owned. This accounts for only 33 head. The Court must remand the solution of The Case of the Missing Cow to the parties.

We must focus upon the commercial sale of these 24 head. These cattle were valued by plaintiff at $400.00 a head, $9,600.00 for loan purposes, but defendant realized between $12,000.00 and $12,700.00 from their sale. In conversion, we must deal with fair and reasonable market values, and the proceeds from the sale of these cattle seems the most reliable guide to that determination. The defendant sold the cows in lots of six on four occasions between the early autumn of 1979 and May of 1980. The defendant testified that the cows were sold to obtain funds to purchase feed, maintain equipment, and, generally, to continue operation of the farm and maintain his family. He testified that it just did not occur to him that plaintiff had an interest in these cows. This Court can accept defendant's explanation of why the cows were sold, and can appreciate the financial bind in which he found himself, but defendant's contention that he was completely oblivious to the encumbrance on these cattle, and plaintiff's rights, is incredible. Many things may have impelled defendant to adopt the course of action which he pursued, but the only rationale which the Court can identify from the testimony is that Pommerer thought that he could feed the leased cattle with the funds obtained from the sale of his own cattle, and then make the payments to plaintiff from proceeds of the milk produced by the leased cattle. By this means, he could save his farm, and the machinery and farm equipment, with the hope of better times. This, however, was not solely his decision to make, and it involves a deliberate and intentional plan made with knowledge and with appreciation that if it succeeded he would benefit, and if it failed, plaintiff would suffer, but he would be no worse off. This is an aggravated wrong,

and not an innocent technical conversion. It evidences a willingness to inflict harm on another on the off-chance that he could benefit himself. This is the type of conversion which the Code contemplates excepting from benefits of a discharge. The liability arising from this conversion is measured by the fair and reasonable market value of the property converted. The Court finds this to be $12,000.00.

Plaintiff's prevailing on this cause of action based on conversion is of import only if, for some reason, the judgment obtained on the first cause of action based on fraud, is nullified. The damages cannot be individually allocated to permit a double recovery. The damages resulting from the conversion are submerged in the total damage attributed to the initial fraud.

## IV.

Defendants, by counterclaim, seek avoidance of the lien claimed by plaintiff on all farm machinery and equipment, pursuant to the provisions of Title 11 U.S.C. § 522(f). Defendants contend that the existence of the lien impairs exemptions to which they are entitled under the provisions of Title 11 U.S.C. § 522(b). Plaintiff contests this claim by, among other things, contending that defendants are not farmers and are not entitled to the exemptions which are claimed; and, even if the exemptions claimed are properly allowed, Sec. 522(f) is unconstitutional and the lien subsists.

The defendants have claimed exemptions from a Farmall Tractor and other farm machinery and equipment pursuant to §§ 522(d)(5) and (6). The statute provides, where pertinent:

"(d) The following property may be exempted under subsection (b)(1) of this section:

(1) The debtor's aggregate interest, not to exceed $7,500 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence, in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial

plot for the debtor or a dependent of the debtor.

. . . .

(5) The debtor's aggregate interest, not to exceed in value $400 plus any unused amount of the exemption provided under paragraph (1) of this subsection, in any property.

(6) The debtor's aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor."

The exemptions are obviously measured by dollar value of debtors' interest in the property which they wish to retain. Just as obviously, it is incumbent upon the debtors to furnish those values to the Court. In this case, debtors claim no exemption under subsection (d)(1) and set forth the claimed exemptions, where pertinent here, as follows:

```
"4. Implements of 1 Farmall 11 U.S.C.
 the trade of super MTA §522(d)(6)
 the debtors diesel tractor
 narrow front $1,500.00

 . . . . .

6.
 A. Cash on
 hand 10.00
 B. 14 foot
 rowboat 200.00 11 U.S.C.
 C. farm equip-
 ment(see 13975.00 §522(d)(5)
 List III $14,185.00
 attached)
 D. Tax refunds, wages, milk funds, accrued
 Public benefits, nominal sums on deposit,
 if any, exact amount unknown but less
 than the unused amount."
```

The United States Trustee has allowed the exemptions as claimed. Quite apparently, the exemption for the Farmall Tractor was allowed as a tool of trade of both debtors. *See, § 522(m)*. The Trustee must have concluded, therefore, that both debtors are farmers. Plaintiff made no objection to this determination. *See, § 522(l)*. However, this Court finds no authority for the proposition that this failure now forecloses the Court from considering the question of debtor's vocational status in this action. The threshold issue which must be determined, therefore, is whether or not debtors are farmers. There is ample evidence that Pommerer has been engaged in farming in one way or another for many years. Part-

time employment as a truck driver to augment family income does not destroy his primary occupational pursuit. One would have to blind oneself to reality not to also recognize that a small farm in Minnesota is a family occupation. Mrs. Pommerer, therefore, must also be considered a farmer. That they do not, in fact cannot, farm at the present time does not necessarily destroy this status. The testimony indicates that defendants intend to resume farming just as soon as circumstances permit. Their intention must be afforded great weight. Abandonment of a trade requires an intentional abandonment. *See, Cable v. Hoolihan*, (1906) 98 Minn. 143, 107 N.W. 967; In re Fox, (5th C.A. 1924) 2 F.2d 374. It is not for this Court to judge the wisdom, or even the feasibility, of defendants attempting to resume farming. This court finds nothing in the law which conditions the exemption for tools of a trade upon the debtor successfully pursuing that trade. If debtors intend to be farmers, so be it. The Court finds that defendants are farmers, and that they are entitled to the exemptions claimed and allowed.

b.

This determination forces us to face the constitutional issue raised by plaintiff.

The Bankruptcy Code of 1978 was enacted on November 6, 1978. Section 522 of the Code was made effective October 1, 1979. The lien with which we are concerned was created in May 1979, during the interim period between the enactment of the Code and the date upon which the provision empowering the Court to set aside certain liens went into effect. Plaintiff contends that the provision deprives it of property without due process of law and violates the Fifth Amendment to the United States Constitution. The plaintiff premises its argument upon three Bankruptcy Court decisions which plaintiff cites as unreported, *Schulte v. Beneficial Finance of Kansas, Inc.*, (Bkrtcy.Kansas 1980) 8 B.R. 12; *Hoops v. Freedom Finance & Security Industrial Bank*, (Bkrtcy.Colo.1980) 3 B.R. 635; *Rodrock v. Security Industrial Bank*, (Bkrtcy.

Colo.1980) 3 B.R. 629. These cases are readily distinguishable. In all of these cases the liens in issue were created prior to November 6, 1978. The reasoning of each of these courts has persuasive effect, for they are thoughtful and well written, but the holding of each must be restricted to the facts.

There is a distinction between the constitutional protection afforded liens created prior to the enactment of the Code, and the constitutional protection afforded to liens created during the gap period between enactment of the Code and the effective date of the Section. This distinction has legal ramifications, and has heretofore been recognized. *See, e. g. In re Pierce*, (Bkrtcy. Okla.1980) 4 B.R. 671; *Oldham v. Beneficial Fin. Co., etc.*, (Bkrtcy.N.M.1980) 7 B.R. 124; *In re Hawley*, (Bkrtcy.Ore.1980) 4 B.R. 147; *Lucero v. Security Industrial Bank*, (Bkrtcy. Colo.1980) 4 B.R. 659; *but, cf. In re Primm*, (Bkrtcy.Kan.1980) 6 B.R. 142.

c.

 In approaching the determination of this issue we must first determine whether or not Congress intended that this Section of the Code apply retrospectively. *See, Hassett v. Welch*, (1938) 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858. Retrospective application of a law is the exception, not the rule, and that intention must be clearly manifested by the unequivocal and inflexible import of the terms of the legislation. *Ginsberg v. Lindel*, (8th C.A. 1939) 107 F.2d 721. An analysis of the Bankruptcy Code leads one ineluctably to the conclusion that Congress intended a retrospective application of this law. Section 403 of Pub.L. 95–98, Title IV, 92 Stat. 2683, provides that:

"A case *commenced* under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted." (Italics added)

For all other purposes the Bankruptcy Act was repealed. *Sec. 401, supra.* This clearly manifests an intention that all procedural and substantive rights of debtors and creditors in cases filed after October 1, 1979 would be governed by the provisions of the Code. Otherwise there would be no applicable bankruptcy law in effect. Congress certainly did not intend to create a void. Historically, and of necessity, bankruptcy statutes have been applied to contract and property rights and interests which were in existence on the date of enactment. Congress, therefore, was merely observing precedent.

d.

Once the retrospective application of the Code is established, there are two provisions of the Constitution with which one must be concerned in proceeding to address this issue. Article 1, § 8, Cl. 4, provides in part as follows:

"The Congress shall have power .... to establish ... uniform laws on the subject of Bankruptcies throughout the United States."

Superimposed upon this general power is the superior prohibition of the Fifth Amendment, contained in the Bill of Rights, which, where pertinent, is as follows:

"No person shall ... be deprived of life, liberty or property, without due process of law...."

The grant of power to the Congress to enact uniform Bankruptcy Laws envisions laws which impair contractual rights. *Hanover National Bank v. Moyses*, (1902) 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113; *In re Inland Dredging Corp.*, (2nd C.A. 1932) 61 F.2d 765. This is inherent in any bankruptcy law. Without attempting an overly exhaustive review of the cases which have held that the retrospective application of § 522(f) is unconstitutional, this Court has concluded that most of these cases involve liens which arose prior to enactment of the Code, and that most of these decisions rely upon an extension of the rationale of *Louisville Joint Stock Land Bank v. Radford*, (1935) 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, which held that the Frazier-Lemke

Act of 1934 was unconstitutional. The Frazier-Lemke Act was passed during the time that this nation was engulfed in the throes of the great Depression with a view to providing farmers with a means of avoiding loss of the family farm through mortgage foreclosure. The Act empowered the Court to grant a farmer a five year immunity from foreclosure of a mortgage, permitted the farmer to retain possession of the real estate, for a reasonable rental, and to purchase the real property free and clear of the mortgage, at the expiration of the five year period, upon payment of a judicially appraised value for the farm. The Court first stated the issue:

"The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment. Under the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the States, it is not prohibited from impairing the obligations of contracts.... But the effect of the Act here complained of is not the discharge of Radford's personal obligation. *It is the taking of substantive rights in specific property acquired by the Bank prior to the Act."* (Italics added) 295 U.S. at 589–90, 55 S.Ct. at 863.

The issue before the Court was narrow, and it should not be enlarged to embrace the taking of substantive rights in specific property acquired after the passage of an Act. The Court went on to further qualify this language as follows:

"The province of the Court is limited to deciding whether the Frazier-Lemke Act *as applied* has taken from the Bank without compensation, and given to Radford, rights in specific property which are of *substantial* value." (Italics added) 295 U.S. at 601, 55 S.Ct. at 868.

This clearly indicates that Fifth Amendment rights are subject to some individually applied quantitative standard. The Court concluded:

"... the Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for wholly public use without just compensation. If the public interest requires, and permits, the taking of proper-

ty of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation the burden of the relief afforded in the public interest may be borne by the public." 295 U.S. at 602, 55 S.Ct. at 869.

This was the Court's direct holding, which must be read in the light of the issue posed, and upon which must be superimposed the clear quantitative qualification of "substantial" value.

At the outset, the quantitative qualification is troublesome. Some courts have ignored it, others have carefully refrained from according to the quantitative standard a qualitative import to differentiate lien rights in real property from lien rights in personal property. *See, e. g., Rodrock v. Security Indus. Bank,* (Bkrtcy.Colo.1980) 3 B.R. 629. This approach has the merit of recognizing that lien rights in personal property can have substantial value. It leaves unresolved, however, the crucial question of the magnitude which a right in specific property must attain to be of "substantial value". This may have to be determined in each case, and may be the concept through which the Courts can preserve the constitutionality of complete retrospective application of the Code and thereby effect Congressional intent. The intent of Congress seems to have been to preserve a debtor's household goods, and property of that nature of little resale value, from enforcement of a non-purchase money non-possessory lien of equivocal value, save as a coercive tool. A similar intent in regard to other types of property, which may be exempt under the Code or state statute, and which may be of considerable resale value, is not easily discernible. The courts, however, by making a factual determination of whether or not the lien rights are of substantial value on a case by case basis could avoid any statutory encroachment upon the constitutional limitation of the due process clause enunciated in *Louisville Joint Stock Plan Bank.* An invitation to adopt this novel procedure seems inherent in the Court's language in that case.

However, whether or not *Louisville Joint Stock Land Bank v. Radford* has any current value as precedent is subject to reasonable doubt. Times have changed, and a review of its progeny discloses a constant and steady erosion of its vitality, *see, e. g., Wright v. Vinton Branch,* (1937) 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; *Adair v. Bank of America,* (1938) 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889; *Wright v. Union Central Ins. Co.,* (1938) 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490; *Wright v. Union Central Ins. Co.,* (1940) 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184. The substantive due process concept upon which it is bottomed is discredited and moribund. *See, e. g., Nebbia v. New York,* (1934) 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; *Lincoln Union v. Northwestern Co.,* (1949) 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212; *Day-Brite Lighting, Inc. v. Missouri,* (1952) 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469; *Ferguson v. Skrupa,* (1963) 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93.

In this Court's opinion, *Louisville Joint Stock Land Bank v. Radford* has no precedential value, by holding or through rationale, to the facts of this case.

### V.

We must turn, then, to the facts of this case and determine what approach is either mandated or available in regard to the Constitutional issue as it pertains to liens generated in the time period after passage of the Code and before its effective date.

The government takes the position that § 522(f)(2) is constitutional only insofar as it enables debtors to avoid the security interest to the extent of the $750.00 aggregate exemption for tools of trade provided by § 522(d)(6), but not insofar as it would permit avoidance of the spill-over amount of an exemption provided for by § 522(d)(5). The argument presented, however, is not even remotely related to the issue of the constitutionality of the application of § 522(f)(2) to exemptions provided in § 522(d)(5). It is premised upon the government's version of Congressional policy and intent. The government contends that § 522(d)(5) was inserted in the Code to avoid discrimination between homeowner

and non-homeowner, that the homestead exemption is not protected against non-possessory non-purchase money security interests, that to permit avoidance of liens on the spill-over portion of exemptions for a non-homeowner enlarges the amount of personal property upon which liens can be avoided. Ergo, says the U.S. Trustee, this discriminates against the homeowner and is contrary to Congressional policy and intent. This circumvolated reasoning may have some well concealed merit, but it does not persuade this Court that judicial distortion of the language utilized by Congress is mandated. Section 522(f) states:

"... the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b)...."

(The phrase is not without ambiguity in that it refers to an exemption "to which the debtor would have been entitled", rather to an exemption which has been claimed and allowed. We can leave the problem which this poses for another day, and, hopefully, for some other forum.)

One must assume that Congress was aware of the provisions of subsection (b) when it adopted the Code. If an intention to further qualify the quality or the quantity of exempt property made subject to the right granted a debtor by subsection (f) existed, it would have been clearly stated. The government can be complimented on its imaginative approach, but its effort to preserve the constitutionality of this subsection on a piecemeal basis by a transmogrification of the statute is rejected. The statute must stand as written, or it must fall.

### b.

The Bankruptcy Code was enacted to adjust the benefits and burdens of modern economic life, and is impressed with a presumption of constitutionality. *See, Usery v. Turner Elkhorn Mining Co.,* (1976) 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752; *Ferguson v. Skrupa, supra; Williamson v. Lee Optical Co.,* (1935) 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563. This presumption can be

rebutted only by establishing that Congress acted arbitrarily and irrationally. This, in turn, depends upon whether or not the means which the Act of Congress employed to achieve the legitimate goals of the Bankruptcy Code are reasonable, or are so grossly arbitrary as to be incompatible with the fundamental law of the land. *See, Campbell v. Alleghany Corp.*, (4th C.A. 1935) 75 F.2d 947; *Hanover National Bank v. Moyses, supra; In re Chicago, R. I. & P. R. Co.*, (7th C.A. 1937) 90 F.2d 312. The burden of proof in this regard rests on he who asserts the unconstitutionality of the statute. *Metropolitan Casualty Insurance Co. v. Brownell*, (1935) 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070. In a trial court, that burden is heavy. An adverse decision on the constitutionality of a federal statute would seem to lie peculiarly within the domain of appellate courts unless the defect in the statute is crystalline. *Thompson v. United States*, (Pa.1957) 148 F.Supp. 910.

One primary purpose of the Bankruptcy Code is to afford the financially beleagured a fresh start by readjusting financial rights and liabilities. *Lines v. Frederick*, (1970) 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124; *Matter of Vickers*, (10th C.A. 1978) 577 F.2d 683; *Local Loan Co. v. Hunt*, (1934) 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230. This offends no constitutional principle. *See, Usery v. Turner Elkhorn Mining Co., supra; Fleming v. Rhodes*, (1947) 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368; *Carpenter v. Wabash R. Co.*, (1940) 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558; *Norman v. Baltimore & Ohio R. Co.*, (1935) 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885. A fresh start cannot be attained by returning a debtor to point zero. Sec. 522(f) encompasses property which Congress envisioned as necessary to give substance to the concept of a fresh start. This property is required for the maintenance, health and welfare of the debtor and his family, and avoids literal destitution. Eliminate them and the debtor would be left financially fresh, but without a start. *Cf., In re Perry*, (Ohio 1963) 225 F.Supp. 481. In the past creditors lending money to a consumer debtor would obtain a security interest in all of the debtor's household goods, furniture, appliances, tools, etc.,

then owned or thereafter acquired, and couple this with a waiver of exemptions. The liened property was, in most instances, of little monetary value to the creditor, but beyond the capacity of the debtor to replace. The creditor possessed a coercive weapon which virtually placed the debtor in bondage, thwarted the purposes of exemption and bankruptcy laws, and denied the debtor a realistic fresh start. Congress acted to remedy this unfair practice by affording the debtor a right to avoid a judicial lien or a non-possessory, non-purchase money security interest which impairs an exemption in specified categories of personal property. This destruction (avoidance is merely a nicer word) of liens and lien rights is not an innovation. *See, e. g., Secs. 60(a), 67(a), 70(c), Bankruptcy Act.*

The Congressional power to impair private contracts is historically recognized.

"Nor can it be truly asserted that Congress may not, by its action, indirectly impair the obligation of contracts, if by the expression be meant rendering contracts fruitless or partially fruitless. Directly it may confessedly, by passing a bankrupt act, embracing past as well as future transactions. This is obliterating contracts entirely." *Legal Tender Cases*, (1870) 12 Wall 457, 549, 79 U.S. 457, 549, 20 L.Ed. 287.

This power to legislate the effect of an existing contract is impressed upon every private contract, and the agreement of the parties is subject to that power. *Louisville & N. R. Co. v. Mottley*, (1910) 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297. The Court made this crystal clear in *Wright v. Union Central Ins. Co.*, (1938) 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490, when it said:

"The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent. 'Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a

postulate of the legal order.' " *(Citing Home Bldg. & Loan Assn. v. Blaisdell,* (1934) 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413). 304 U.S. at 516, 58 S.Ct. at 1033.

A lienor's contractual rights are at all times subject to bankruptcy legislation which affects the creditor's remedy, or which alters the extent of the creditor's participation in a distribution of the debtor's assets. *In re Chicago, R. I. & P. R. Co., supra.* Parties to a security agreement, therefore, are chargeable with knowledge that the rights and remedies to which they have privately agreed may be modified by provisions of the bankruptcy statute. *In re Prima Co.,* (7th C.A. 1937) 88 F.2d 785; *In re Head,* (Bkrtcy.Tenn.1980) 4 B.R. 521; *see, Hanover National Bank v. Moyses, supra.* A security agreement executed after passage of the Bankruptcy Code incorporates a provision, by operation of law, which qualifies the property right embodied in certain liens by giving to the debtor the right to nullify the lien in the event that he seeks debtor's relief under the Bankruptcy Code. In reality, therefore, applying Sec. 522(f) to a lien created after enactment of the Code is not a genuine retrospective application of law. The law existed at the time that the lien was created. The application is prospective. Nor does it deprive the creditor of property or a property right. The debtor is merely availing himself of the terms of a provision written into the contract which established the nature and extent of the creditor's property right. Once the determination is made that the statute does not deprive the creditor of property, of course, the constitutional issue evaporates. *Cf., Diamond Glue Co. v. United States Glue Co.,* (1903) 187 U.S. 611, 23 S.Ct. 206, 47 L.Ed. 328.

#### c.

■ Assuming, for the nonce, that this creditor does have a property right, of which he is being deprived, will not alter this Court's conclusion. The Fifth Amendment does not prohibit legislation which affects remedies or property interests granted by private contract if the statutory provisions are consonant with what is fair, reasonable and equitable. *See, Anderson National Bank v. Luckett,* (1944) 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692; *Kuehner v. Irving Trust Co.,* (1937) 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340. Perhaps this precept is related and interlocked with the "substantial value" concept enunciated in *Louisville Joint Stock Land Bank v. Radford.* The essence of bankruptcy laws is to rearrange rights and liabilities between debtor and creditor. This, in and of itself, does no violence to constitutional principles if the statute is not arbitrary or capricious. *See, Fleming v. Rhodes, supra.; Carpenter v. Wabash R. Co., supra; Norman v. Baltimore & Ohio R. Co., supra.; Kuehner v. Irving Trust Co., supra; Nebbia v. New York, supra.; SEC v. Albert & Maguire Securities Co.,* (Pa.1974) 378 F.Supp. 906. Congress has attempted to fashion an effective mechanism for rehabilitation of consumer debtors. The rehabilitation is possible only if the enumerated classifications of property are exempt from confiscation by all creditors by whatever means. This effort is doomed to fail if blanket liens on consumer goods essential to that rehabilitation are preserved. This Court is not persuaded that this legislation, designed to prevent frustration of a congressional purpose, is arbitrary, capricious, or inequitable and constitutionally defective.

#### d.

Finally, to end this discussion where it probably should have begun, we must take a pragmatic approach. A basic premise of bankruptcy, and the purpose of bankruptcy laws, is the realignment of the obligations and liabilities of debtors and the concomitant rights and interests of creditors. The debtor must benefit and the creditor must suffer. In 1981, whether or not an ordinary unsecured debt which can be converted into judgment and enforced by levy and execution is a property right of which the creditor is deprived by the application of the Bankruptcy Code is of more than academic materiality. Is the right to collect compensation for the goods or services, with which the creditor parted upon the debtor's promise to pay, any less a property right than a non-possessory, non-purchase money security interest?

The gradual demise of substantive due process has been accompanied by an enlargement of what is considered property as that word is used in the Fifth Amendment. In the procedural due process context, the Supreme Court in *Board of Regents v. Roth*, (1971) 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 with reasonable clarity, set forth the parameters of those interests which will be considered property interests, as follows:

"Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577, 92 S.Ct. at 2709.

If the doctrine of substantive due process is merely infirm and not dead, its flickering life flows from the same language in the Fifth Amendment from which procedural due process emanates. It is logical that "property" be the same for both arms. An unsecured creditor has more than an abstract need, desire or unilateral expectation of payment—he has a legitimate claim of entitlement to it. Is this not a property interest? Is it entitled to any less constitutional protection than the liens falling within the provisions of Sec. 522(f)? Is a contract which affords access to all of the non-exempt assets of a debtor any less inviolable than a contract which grants access to specified exempt personal property? If we have accepted the erection of some sort of hierarchy for debts, wherein real estate mortgages are superior to liens on personal property and liens on personal property are superior to unsecured debts, is there really a constitutional basis for relating this ascending order to the protection afforded by the due process clause? Is a million dollar judgment creditor, on the verge of levy on a million dollars worth of assets, who is relegated to the mass of unsecured creditors for a pro-rata participation in liquidation of those assets by an intervening Chapt. 7 Order for Relief, really being deprived of something less than a secured creditor whose non-possessory, non-purchase money lien on an old refrigerator is nullified? This Court thinks not, yet no one contends that the discharge provisions of the Bankruptcy Code are unconstitutional when applied to unsecured debts which pre-date its enactment or arose during the hiatal period. With good reason. Yet, if we embrace the position of those who seek to strike down Sec. 522(f), and if we accept the definition, and apply the attributes, of property to which the Supreme Court has afforded procedural due process protection as also subject to whatever is left of substantive due process protection, the discharge provisions of the Bankruptcy Code affecting debts incurred prior to its enactment are of doubtful constitutionality.

It appears to this Court that we must sit back and recognize that the congressional power to establish uniform laws on the subject of bankruptcies is virtually supreme, and that this power permeates a broad area which includes more than simply discharging debts and establishing exemptions. If the financial, commercial and economic structure of the nation is to be preserved, disruption of debtor-creditor relationships, within constitutional bounds, must be accepted. Those bounds, however, were not rigidly constructed in 1787. The Constitution maintains an elasticity to conform to the nation's growth. This, the general welfare demands. Today, an Act of Congress designed for relief of debtors, in this debt burdened economy, should not be

held to violate the Fifth Amendment, sans a clear and convincing demonstration that the adverse effect upon substantial private rights greatly outweighs the social benefit. This is consistent with the approach taken to protective and social legislation in other respects, and will maintain a just balance between what appear to be competing clauses in the Constitution. This Court concludes that Sec. 522(f) does not destroy that balance, and that it is constitutional.

Wherefore, upon the foregoing, it is—

ORDERED, ADJUDGED and DECREED:

1) That debtor's obligation to plaintiff is nondischargeable in this proceeding.

2) That plaintiff is entitled to, and is hereby awarded, judgment against debtors in the amount of $20,257.79, and the Clerk of Court is directed to enter judgment accordingly.

3) That debtor's claim to exemptions shall be, and hereby is, allowed.

4) That the liens claimed by plaintiff upon personal property which debtors claim exempt shall be, and hereby are, adjudged null and void.