In re Lowell Verdain NELSON and Grace Alice Nelson, Debtors.

**SECURITY STATE BANK OF HOUSTON, Plaintiff,**

v.

**Lowell Verdain NELSON, Defendant.**

Bankruptcy No. 3–83–1498.
Adv. No. 3–83–0488.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Nov. 12, 1985.

Richard C. Thompson, LaCrosse, Wis., for plaintiff.

Sheridan J. Buckley, St. Paul, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matter came on for trial before the undersigned United States Bankruptcy Judge on October 25, 1985, at St. Paul, Minnesota. Plaintiff appeared by its attorney, Richard C. Thompson. Defendant Lowell Verdain Nelson (hereinafter "Debtor") appeared personally and by his attorney, Sheridan J. Buckley. Upon the evidence adduced at trial, the arguments of counsel, and all of the other files and records herein, the Court concludes that Debtor's debt to Plaintiff is not excepted from discharge in bankruptcy.

### FINDINGS OF FACT

Debtor filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code in this Court on September 1, 1983. Included among the debts set forth on his Schedule A–3 were two entries for Plaintiff in scheduled amounts of $19,603.84 and $3,946.87. These debts are the subject of these adversary proceedings for determination of dischargeability.

Debtor has been self-employed in agriculture and agriculture-related business since the early 1950s. In December, 1953, he started a feed business in Houston County, Minnesota, with his father. Early on, he obtained secured financing for this operation from Plaintiff. Debtor and his father later incorporated this business and finally sold it in March, 1976, on sale and land contracts. Debtor then commenced livestock and cash crop farming in Houston County, Minnesota. On numerous occasions from 1976 on, Debtor obtained secured financing for his farming operations from Plaintiff and other banks and financial agencies. He continued these operations until 1983, through a number of different entities. Under the corporate form of "Nelson Feed Store, Inc." he farmed his own land which the corporation rented from him. In the early spring of 1979 he

and his son Dallas Nelson formed a partnership under the name of "Nelson Farms" for the purchase, ownership, and farming of a 140-acre Houston County parcel known as the Matt Schiltz farm. Debtor did not always strictly observe the formalities of these entities in record and non-record ownership of farming equipment and livestock, but this seems not to have concerned Plaintiff's employees or those of other lenders.

Debtor and his son required financing for the $20,000.00 down payment required for the purchase of the Matt Schiltz farm. On March 8, 1979, Debtor submitted a personal financial statement to Plaintiff through its loan officer, Bruce Henry. This financial statement contained asset entries for Debtor's various interests in the proceeds of sale of the feed store business; farming equipment, livestock, and inventory; and other business and farming assets. It did not purport to summarize Dallas Nelson's current financial condition and did not schedule 28 beef cows which Dallas then owned. Mr. Henry approved the application for secured financing and on March 8, 1979, Debtor and Dallas Nelson executed a security agreement granting Plaintiff a security interest in the 28 beef cows and a John Deere 3300 self-propelled combine held as an asset by one of Debtor's business entities. Testimony at trial differed as to objective indications of the ownership of the beef cows, but there is no question that Mr. Henry recognized that Dallas Nelson held at least a partial ownership interest in the cows.[1] This security agreement provides in pertinent part:

B. Debtor will not sell or offer to sell or otherwise transfer or encumber the property except as hereinafter provided without the prior written consent of Secured Party will keep the Collateral in good order and repair, and will not waste or destroy the Collateral, and if farm property will maintain the same in a good and husbandlike manner.

Plaintiff's security interest was duly perfected by filing on March 9, 1979.

During the course of the succeeding four years, Debtor renewed or refinanced this and one other pre-1979 loan, obtained four other loans from Plaintiff, and renewed or refinanced the additional loans, all via numerous transactions.[2] He renewed and partially paid many of these loans at the six-month due dates on their notes. On March 28, 1980, Debtor gave a second financial statement to Mr. Henry, this time scheduling 28 beef cows as his asset. Mr. Henry filled in the blanks on this financial statement using information from the earlier one and other documents from the 1979 loan. Debtor signed it realizing it scheduled the 28 beef cows; he believed that the statement was required for a renewal of the loans originally secured by these cattle, that the entry indicated that the cattle were still maintained by his family as a part of their consolidated operation, and that his son's continued ownership was therefore indicated by the entry. On March 28, 1980, Debtor and his son Dallas again executed a security agreement granting Plaintiff a security interest in 28 beef

---

1. Dallas Nelson also obtained several secured equipment loans from Plaintiff from 1977 through 1981, none of which are relevant to these proceedings. It is quite possible he had submitted personal financial statements to Plaintiff in conjunction with these transactions, and that Mr. Henry had these on file and used them for asset evaluation during the loan transactions involved here. However, neither party introduced evidence bearing on this point.

2. Debtor entered into evidence copies of forty different notes which he executed individually or on behalf of one of his business entities in favor of Plaintiff between April 20, 1977, as well as a written summary of all payments made as they applied to the serial transactions based on six original loans. It appears that Debtor made payments of interest or interest and principal as he was able, not always on the due date of a note, and that Plaintiff renewed earlier obligations by having Debtor execute a renewal note on the occasion of nearly every payment after November, 1978. All of these notes were secured by the Security Agreement executed by Debtor and his son next preceding the date of the note. Debtor eventually paid two of the original loans in full and it appears that two more of them were consolidated in April, 1982, resulting in a total of three loans outstanding when Debtor filed his Chapter 7 Petition.

cows and one John Deere 3300 self-propelled combine. This security agreement contained terms limiting Debtor's right to sell the collateral that were identical to those in the March 8, 1979 security agreement.

When Debtor and his family expanded their farming operations during the 1980 crop year, Debtor concluded that he needed a larger combine. During the fall of 1980, Debtor traded the John Deere 3300 combine in on a model 6620 combine, which he then held jointly with his son Dallas and his son-in-law James Paulson. Debtor may have notified Mr. Henry during casual conversation before the trade and seems to have done so afterwards. Apparently, Mr. Henry did not object on either occasion to the disposition of the 3300 combine.

To secure his continuing obligations to Plaintiff, Debtor and his son executed a third security agreement on April 13, 1981. On its face, this security agreement granted Plaintiff a security interest in 28 beef cows, a John Deere 3300 self-propelled combine, and a Redi-haul flatbed trailer.[3] By this time Debtor no longer owned the 3300 combine. This security agreement provides in pertinent part:

> 3. ... (ii) except as hereinafter provided, [Debtor] will not sell or offer to sell or otherwise transfer the Collateral or the proceeds thereof or any interest therein without the written consent of Secured Party.

During the spring and summer of 1981, Dallas Nelson and his wife began to separate their farming operations from Debtor's operations. Dallas' beef cows (by this point fewer in number than 28) were aging and he wished to dispose of them. Debtor owned 10 dairy cows at that time. When his son expressed an interest to get more involved in dairy farming, Debtor agreed to trade Dallas' remaining beef cows for Debtor's dairy cows. At some point between April 13, 1981, and August, 1981, the "swap" was made and each party assumed exclusive responsibility over his new herd. Debtor mingled his son's beef cows with about twenty other beef cows which Debtor then had. After the exchange Debtor believed that Plaintiff's security interest had now attached to the dairy cows in his son's hands and that the beef cows which he now held were free and clear. By May 17, 1982, Debtor sold all of the beef cows at the livestock auction at Caledonia, Minnesota, in lots of one or two up to ten. He sold all of the cows as they were too old to breed any longer. He did not advise auction personnel that Plaintiff might have had an interest in the beef cows; they made all of the checks for auction proceeds payable to Debtor alone. The average auction sale proceeds of the beef cows at auction was $427.00 per cow. Debtor deposited all auction proceeds into his own checking accounts, commingling them with other receipts from his farming operations. He did so with the understanding that he would make payments on his notes to Plaintiff when he was able, and in any event when they came due at six-month intervals, with the funds which he then held. He did not tell Mr. Henry about the sales before he filed his bankruptcy petition. Though the terms of the note prohibited disposition of Plaintiff's collateral without its consent, at no time during this four-year period did Mr. Henry even inquire as to whether the beef cows were still marketable in spite of age, whether Debtor had replaced the original cows with

---

**3.** As entered into evidence, this Security Agreement included handwritten alterations and additions to the typewritten notations for this collateral, changing the number of beef cows to 25, and adding the following language below the typewritten notations:

1 John Deere 6620 33,000oo 4–1–82
1 John Deere 4400 combine platform w/ corn grainhead

In August, 1982, Debtor traded the 6620 combine in on a John Deere 4400 combine as he was now again farming fewer acres and did not need the larger machine. He told Mr. Henry about the second trade shortly before or after it took place. Mr. Henry apparently took no action in response to the revelation. Mr. Henry testified that he added these handwritten notations in 1982, as reminders to himself of Debtor's acquisition of the new items, rather than as language which would operate to create a security interest in them.

young stock, or whether Debtor had disposed of them. At trial, Debtor professed ignorance of the security agreement terms limiting his right to sell the beef cows; he stated that in commingling the proceeds of Plaintiff's collateral and using it until notes came due, he was just following past practice established in his prior dealings with Plaintiff, as well as standard practice among farmers liquidating livestock collateral before the due date of the note which it secured.[4] During the two-year period from the exchange through Debtor's bankruptcy, Debtor continued to make payments on the several notes and to periodically renew them in accordance with prior practice. Between August, 1981, and September 1, 1983, Debtor generated enough farm income and sale proceeds from collateral to pay a total of over $43,550.00 in principal and interest to Plaintiff on the debts relevant to this adversary proceeding. The last renewals of the three outstanding notes took place on July 27 and August 29, 1983. The total outstanding balance on the notes as of September 1, 1983 was $21,438.37.

### CONCLUSIONS OF LAW

Plaintiff seeks to have a portion or all of Debtor's debt to it found nondischargeable under the following provision of 11 U.S.C. § 523(a):[5]

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

4. Debtor testified most farmers did not immediately pay over proceeds from livestock sales to secured parties, as they usually would not market an animal unless they had a young animal to replace it in the herd for security purposes. Plaintiff did not introduce evidence to dispute that this was community custom and usage condoned by Plaintiff.

5. Plaintiff's Second Amended Complaint pleaded both §§ 523(a)(4) and 523(a)(6) as grounds

As in the other enumerated grounds for nondischargeability under § 523(a) in which a creditor has the initial burden of timely commencing proceedings, the petitioning creditor alleging willful and malicious conversion of security must prove all elements by clear and convincing evidence. This is a burden of proof more stringent than the standard burden in civil cases of a preponderance of the evidence. *In re Pommerer*, 10 B.R. 935, 938 (Bankr. D.Minn.1981); *In re Egan*, 52 B.R. 501, 506 (Bankr.D.Minn.1985). *See, in general, In re Huff*, 1 B.R. 354 (Bankr.D. Utah 1979).

Though § 523(a)(6) does not specifically so provide, the phrase "willful and malicious injury" includes a willful and malicious conversion of secured property. S.REP. No. 989, 95th Cong., 2nd Sess. 79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5862; 3 COLLIER ON BANKR. ¶ 523.16 at 523–130 (15th ed. 1984); *In re Pommerer* at 940; *In re Egan* at 505–506. For bankruptcy purposes, conversion is basically defined as the wrongful assumption of dominion by one person over personal property belonging to another, to the exclusion of possession and control by the owner and in repudiation of the owner's rights. *In re Pommerer* at 940. A showing of facts sufficient to constitute a technical conversion is not enough to support a finding of nondischargeability. *Id.* Rather, the petitioning creditor must show that the debtor acted with a state of mind both willful and malicious. *In re Egan* at 506. Willfulness and malice are two different characteristics; analysis under § 523(a)(6) must segregate the two elements and should avoid lumping the two "together to create an amorphous standard to prevent discharge for any conduct that may be

for nondischargeability. After the close of Plaintiff's case in chief, Debtor moved for a directed finding on both grounds. The Court denied the motion as to the allegations of willful and malicious conversion of security, but granted it as to Plaintiff's cause of action under § 523(a)(4) because Plaintiff had produced no evidence whatsoever of the creation or existence of a trust relationship between Plaintiff and Debtor giving rise to fiduciary duties in Debtor.

judicially considered to be deplorable". *In re Long*, 774 F.2d 875, 880 (8th Cir.1985).

■ The legislative history for § 523(a)(6) plainly establishes that "willful" means "deliberate or intentional". H.R. REP. No. 595, 95th Cong., 1st Sess. 363 (1977); S.REP. No. 989, 95th Cong., 2nd Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5862–5865. This Court is of the opinion that the willfulness element is intended to separate debts created by a debtor's negligence (which are dischargeable) from debts created by basic actions where a debtor intentionally performed the basic act complained of. *In re Egan* at 506.[6] The Court must therefore determine the basic acts that led to the creditor's injury and then determine whether the debtor performed those acts negligently or intentionally.

■ In the case at bar, a technical conversion of Plaintiff's security took place. Plaintiff's rights in its security were created under the various security agreements and governed by those agreements and Article 9 of the Uniform Commericial Code. Debtor's right to hold and dispose of Plaintiff's collateral was limited by the terms of the security agreements. Those security agreements prohibit any sale or other disposition of Plaintiff's collateral without its prior consent.[7] In selling the beef cows without notifying Plaintiff or obtaining its prior consent, Debtor assumed dominion over them in violation of the agreements, to the exclusion of Plaintiff and in repudiation of its security rights. Debtor's profession that he was unaware of this term is irrelevant to the question of whether he technically converted Plaintiff's property. He signed a security agreement containing the limitation on his rights and the Court deems him to have been on notice of it.

■ Plaintiff has proven that Debtor acted willfully in disposing of its security. The basic acts of which Plaintiff complains were Debtor's sale of the beef cows without Plaintiff's prior consent, and his commingling of the proceeds of sale with his own funds. Debtor did not "accidentally" or "negligently" arrange for the sales, consummate them, and deposit the funds in his accounts. He performed these actions intentionally. His mistaken belief that Plaintiff's security interest was somehow released from the beef cows by the exchange with his son and then somehow reattached to the dairy cows does not negate the willfulness of his actions; nor does it furnish him an affirmative defense. Debtor's belief was unreasonable; it denied the very foundations of the law of secured transactions. At the very least, Debtor should have inquired about the legal status of Plaintiff's security interest to Mr. Henry. He intentionally proceeded with the sales based upon his misperception; in so doing, he willfully caused injury to Plaintiff's rights.

This leaves the element of malice. This Court has previously held that malice may be shown by proof that a debtor disposed of security with the specific knowledge that the disposition would invariably and indubitably cause harm to the secured creditor, or by proof that the debtor had the specific intention of causing harm to the secured creditor by the disposition. *In re Egan* at 507. The specific intent requirement under the latter test could be satisfied by a showing that the debtor knew the plaintiff had specific rights to its security and proceeds, and deliberately disregarded those rights. *In re Pommerer* at 941.

---

**6.** It is not certain whether the words used by the Eighth Circuit in *In re Long* as a synonym for "willful"—"headstrong and knowing"—alter this approach, though the Eighth Circuit did recognize the equivalence of "willful" with "intentional or deliberate". *In re Long* at 880 and 881.

**7.** The April 13, 1981 security agreement does provide that "... Debtor ... may also sell farm products in the ordinary course of business". The beef cows were "farm products" as defined under MINN.STAT. § 336.9–109. Debtor's counsel did not directly raise this provision as a defense on the conversion issue. The Court believes that a sale of livestock made to entirely close out a beef operation is not one made "in the ordinary course of business".

■ This standard has been largely displaced by the holding of the United States Court of Appeals for the Eighth Circuit in *In re Long.* In *Long,* the Eighth Circuit held that a debtor's "knowledge that [a secured creditor's] legal rights are being violated is insufficient to establish malice, absent some additional 'aggravated circumstances' ..." *In re Long* at 880. The Court acknowledged the reported cases' expressions of difficulty in enunciating a single standard for the determination of whether an injury was both "willful" and "malicious" for the purposes of § 523(a)(6).[8] In cases involving alleged conversion of secured collateral, it "determined that a heightened level of culpability must be found, going beyond recklessness and beyond intentional violation of a security interest". Examining precedent going back to the seminal case of *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the Court held that in this context nondischargeability turned

> on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm.

*In re Long* at 881. In so holding, the Eighth Circuit explicitly adopted an objective test for malice under § 523(a)(6). A debtor's malice must be determined at least in part by the objective likelihood of harm to the secured creditor's interests created by the debtor's actions.[9] (Presumably, open expressions of subjective malice are still relevant; in adopting the objective test, the Court was apparently concerned with the much-discussed problem of proof of state of mind in the absence of the rare direct expression of intent and malice.)

■ Both counsel in this adversary proceeding had the benefit of the Eighth Circuit opinion in *Long* and addressed its applicability in closing argument. Applying the *Long* test to the facts as found, this Court concludes that Debtor did not act maliciously in his conversion of Plaintiff's security. There is, first, no proof of subjective malice on Debtor's part; Debtor never harbored any specific intention to prevent Plaintiff from realizing on its security and did not act with any hatred or ill will toward Plaintiff. Applying the objective test for malice, the Court concludes that Debtor's disposition of the beef cows and their proceeds was not certain or almost certain to cause financial harm to Plaintiff during the fall, winter, and spring of 1981–82. The fact that Debtor acted from a subjective belief that he had the right to commingle the proceeds and pay the notes off when due does not excuse his conduct. However, the fact that he believed that he had the financial ability to commingle the proceeds at the time of sale and still pay the notes later in whole or in part does bear on the malice issue. Debtor was still actively farming at the time of the sales; during the course of the next two years, he generated enough income to make very substantial payments to Plaintiff. At the very least, Debtor had the ability to continue with his past practice of paying all interest as it accrued and making irregular principal payments in some amount. Using the benefit of hindsight as the objective test allows, the Court infers that there was no substantial objective likelihood of harm to Plaintiff's right to payment when Debtor converted its security. The fact that Debtor's farming operation later foundered in 1983 does not in itself bear on the likelihood of harm to Plaintiff's interests during 1981 and the early months

---

**8.** See this Court's concern about the same problem in *In re Egan* at n. 3 and 4.

**9.** This displaces the subjective test which this Court adopted in *Egan* on the basis of earlier decisions by former Judge Patrick J. McNulty of this Court including *In re Pommerer.* Whether the Court would have reached a different result in this case under the *Egan* standard is by no means certain. Application of the new test

where a defendant-debtor continued to operate a business after an alleged conversion may ultimately require the Court to open trial inquiry into a broad-ranging examination of the post-conversion viability of the debtor's business and his future prospects of generating income sufficient to pay the debt despite his diversion of collateral.

of 1982. Plaintiff failed to produce any evidence that Debtor was depleting his operations and depriving them of sufficient income-generating capacity by selling the beef cows; Debtor's operations were not exclusively based upon beef sales and his actions did not place Plaintiff completely at risk from the disposition. *Cf. In re Pommerer* at 941. It simply cannot be said that Debtor's actions were "targeted at the creditor ... in the sense that [his] conduct [was] certain or almost certain to cause financial harm". As a result, the Court must conclude that Plaintiff has failed to prove the element of malice.

Because Plaintiff has failed to prove all of the elements of § 523(a)(6) by clear and convincing evidence, the Court cannot find that any portion of Debtor's prepetition debt to it is nondischargeable in bankruptcy.

### ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Debtor's debt to Plaintiff was not excepted from the discharge in bankruptcy granted to Debtor on February 3, 1984.

LET JUDGMENT BE ENTERED ACCORDINGLY.