In re James L. NOWELL, Debtor.

WATERWAYS MARINE, INC., Plaintiff,

v.

James L. NOWELL, Defendant.

Bankruptcy No. GBK78–00062.

United States Bankruptcy Court,
N.D. Mississippi,
Greenville Division.

Nov. 17, 1982.

Philip Terney, of the firm, Robertshaw & Merideth, Greenville, Miss., for plaintiff.

Jerome C. Hafter, of the firm Lake, Tindall, Hunger & Thackston, Greenville, Miss., for debtor/defendant.

## MEMORANDUM OPINION

EUGENE J. RAPHAEL, Bankruptcy Judge.

On April 19, 1978, the bankrupt filed his voluntary petition under the Bankruptcy Act of 1898, as amended. Pursuant to the order of this court dated April 20, 1978, inter alia, fixing July 27, 1978, as the last day for filing objection to the discharge of the bankrupt and likewise fixing July 27, 1978, as the last day for the filing of a complaint to determine the dischargeability of any debt pursuant to sections 17(c)(2) of the Bankruptcy Act, Waterways Marine, Inc., as plaintiff, filed its complaint against James L. Nowell, defendant bankrupt, objecting to the classification of its prior summary judgment against the bankrupt in the amount of $45,998.70 as a claim without priority under schedule A–3 of the bankrupt's said petition. Said petition had listed the claim of Waterways Marine as a claim without priority described as "personal guaranty of accounts with Lamar Transportation". The said complaint filed by Waterways Marine, Inc., included a prayer that the court deny discharge in bankruptcy to James Nowell, and in the alternative, declare James Nowell's debt to Waterways Marine, Inc., not dischargeable.

The undisputed facts established by pleadings or proof as they bear on the pertinent issues in this case are as follows:

In 1976 James Nowell, who was an experienced business executive of several towing companies, organized Lamar Transportation Service, Inc., with Nowell as the sole stock holder. James Nowell, acting as sole stock holder and as corporate president of the Lamar Transportation Service, Inc., sought to obtain credit from Waterways Marine, Inc., for the purchase of marine supplies at Memphis, Tennessee. Waterways Marine, Inc., through its vice-president and general manager, Robert S. (Bob) Luttrell, refused to extend credit to Lamar unless James Nowell agreed to personally guarantee all charges to Lamar Transportation and to give Waterways a personal financial statement to back up his guarantee. The personal guarantee was prepared and signed by James L. Nowell and states in full:

"As we discussed, because Lamar Transportation Service is a newly organized company with no established credit, I will guarantee all charges for Lamar Transportation with Waterways Marine of Memphis".

James Nowell stated in his cover note constituting part of his financial statement as follows:

"As you requested, here is my personal financial statement".

The cover note and attached "Statement of Financial Condition" were each prepared and signed by James L. Nowell exclusively.

The "Statement of Financial Condition" delivered to Waterways Marine listed total assets of $128,505.32, of which $113,979.99 consisted of interests in three closely held corporations:

| | |
|---|---|
| 50% interest General Marine Towing | $ 10,000.00 |
| 50% interest S & N Farms | 77,319.61 |
| 50% interest Wilkerson Barge Line | 26,660.38 |
| | $ 113,979.99 |

The value of the ownership of Wilkerson Barge Line was more fully expanded upon in a footnote which was intended to show that the actual value of the barges owned by Wilkerson Barge Line was in excess of the $53,320.76 indicated by the stated value of a 50% ownership interest:

| Approximate market value of barges: | |
|---|---|
| 38,000 barrels at $18.00 | $ 684,000.00 |
| Debt—12/31/75 | −311,596.00 |
| | $ 372,404.00 |

At the time the financial statement was prepared and delivered James Nowell owned no more than a 25% interest in General Marine Towing and a 25% interest in S & N Farms, and James Nowell owned no interest in Wilkerson Barge Lines. In October, 1976, Nowell conveyed to his wife, without consideration, his 25% interest in S & N Farms, a fact which was not relayed to his creditors. After the conveyance of James Nowell's interest in S & N Farms to his wife, James Nowell continued to serve as vice president of S & N Farms; and the corporate tax returns for the years ending December 31, 1976, and December 31, 1977, show in response to question "H", page 3, that James Nowell was a 50% owner of the corporate stock of S & N Farms. Since the filing, James Nowell, being aware of said notation on the corporate tax returns, contacted the corporate accountant, Elmo Bradley, to request that the 1976 returns be retroactively changed to reflect the transfer of stock ownership which occurred in October, 1976.

The financial statement contained the following entry:

"Liabilities       None"

However, at the time this financial statement was prepared and delivered, James Nowell was personally obligated as the endorser of a corporate note of S & N Farms to Federal Land Bank in the principal amount of approximately $131,267.20. James Nowell was aware of his personal endorsement of said obligation, which appeared on the face of the financial statement of S & N Farms, Inc., which he used in preparing the financial statement delivered to Waterways Marine.

After receiving James Nowell's personal guarantee and financial statement, as well as oral assurances hereinafter described, Waterways Marine agreed to sell fuel and other supplies to Lamar Transportation on credit.

Beginning on May 26, 1976, and continuing through March 30, 1977, Waterways Marine Extended to Lamar Transportation substantial business credit for fuel, parts, and other marine supplies. As of June 22, 1977, the net outstanding balance owed by Lamar Transportation to Waterways Marine was $45,998.70.

Waterways Marine sued Lamar Transportation and James Nowell (personally) for said amount. Shortly after the filing of said suit, James Nowell filed a voluntary petition in bankruptcy for Lamar Transportation Service, which is of record with this court in Cause Number GBK–77–00148, listing $365,820.05 in debts and no assets. Waterways Marine pursued its claim against James Nowell personally to summary judgment rendered by the United States District Court for the Northern District of Mississippi on February 27, 1978. Said judgment was entered in favor of plaintiff, Waterways Marine, Inc., against James L. Nowell in the amount of $45,998.70, bearing pre-judgment interest at the legal rate of six per cent per annum and bearing post-judgment interest from the date of said judgment until paid at the rate of eight per cent per annum. All costs of said action were taxed against defendant, James L. Nowell.

There is contradictory testimony on certain important aspects of this case:

Although James Nowell admitted delivering his personal guarantee and the financial statement signed by him and described in his words as "my personal financial statement", he testified that no further correspondence or conversations occurred between him and any representative of Waterways concerning his financial statement. Specifically Nowell denied that any oral representations concerning the financial statement were made by him to anyone. Nowell contended that credit was extended to Lamar Transportation by Waterways solely on the basis of the personal guarantee and the financial statement as written. Nowell defended his delivery of these documents as not amounting to a materially false financial statement due to the notation appearing at the top of the ledger sheet stating "James L. and Princella W. Nowell". Although Nowell conceded at the trial that all of the interest in Wilkerson Barge Line (including the stated value and the inflated market value of the barges, highlighted by the note in the statement) and one-half of the 50% interest in S & N Farms (the largest asset on the statement) were owned by his wife, he contended that Waterways Marine, Inc., was not misled thereby. Nowell concedes that his wife did not sign the financial statement and that she did not otherwise participate in the negotiations leading to the extension of credit by Waterways Marine, Inc.

The testimony of Waterways' credit representative, Robert Luttrell, and its corporate president, William Tarver, contradicted Nowell's version of certain particulars of what happened after the receipt of Nowell's financial statement and personal guarantee and before credit was extended to Lamar Transportation Service.

According to testimony of both Robert Luttrell and William Tarver, upon receipt by Luttrell of the guarantee and financial statement, Luttrell mailed a copy of the financial statement to Tarver, president of Waterways Marine, Inc., who made final decisions on the extension of credit. Tarver and Luttrell then discussed the financial statement, and Tarver instructed Luttrell to contact Nowell to determine exactly what assets he personally owned. Luttrell testified that he then contacted Nowell, who stated by telephone that he personally owned 50 per cent interests in S & N Farms and Wilkerson Barge Line shown on the statement of financial condition. During this conversation, according to the testimony of Luttrell, Nowell discussed the prospects of the S & N Farming venture and elaborated on the market value of the barges owned by Wilkerson Barge Line. According to Luttrell, the information supplied by Nowell during said alleged conversation confirmed instead of detracting from Nowell's original written statement that the balance sheet was "my personal financial statement". Both Luttrell and Tarver

testified that since the original written statement had been confirmed insofar as the representations of substantial ownership interests on the part of Mr. Nowell were concerned, Tarver approved the extension of credit to Lamar Transportation with Nowell as personal guarantor.

On the question of Nowell's retrospective view of his intent in dealing with Waterways Marine, Inc., there is an interesting, though slight, variation between the testimony of Tarver and Nowell: Interrogation of Mr. Tarver included the following remarks:

Q (Hafter) After the time you terminated the further extension of credit to Mr. Nowell and his company, did you have any conversations with him?

A (Tarver) I did.

Q (Hafter) Could you relate the substance of those?

A (Tarver) Mr. Luttrell ..., I believe, ... told me that Mr. Nowell wanted to talk to me and I didn't see any point of discussing the situation with him, but he told me that he said ...

Q (Judge) Just tell what you said and he said.

A (Tarver) He reached me on the telephone and at that point he said he wanted to talk to me about going on, and I asked him if he could state to me that he had dealt honorably with Waterways Marine, and he said "No sir, I cannot", and I said "You misrepresented your situation with Mr. Luttrell to obtain original credit, and the last week or two you lied to him as to what you were going to receive and how you were going to pay our account", and I told him that there was no reason for us to further discuss it.

Q (Hafter) What was Mr. Nowell's reaction when you told him that?

A (Tarver) He admitted that he had not dealt honorably with us and he said that "the way that I can pay you is if I die and you get the insurance ..."

Mr. Nowell responded to Mr. Tarver's assertion in the following testimony:

Q (Terney) You heard him testify today concerning the statement to you that you dealt dishonorably with his company. Did he make that statement ... such a statement when you talked?

A (Nowell) He might have, I don't recall.

Q (Terney) Do you remember saying that you dealt dishonorably with his company? Did you deal dishonorably with is company?

A (Nowell) I don't know. I did everything to the best of my ability to make money to be square.

On the question of the materiality of the omission of any reference on the financial statement of the contingent liability of Nowell as an endorser of a corporate note of S & N Farms to the Federal Land Bank in the principal amount of approximately $131,267.20, there are further differentials between the testimony of Mr. Tarver and Mr. Nowell.

The cross-examination of Mr. Tarver by bankrupt's attorney included the following dialogue:

Q (Terney) Is it unusual for a finance statement to be prepared and submitted to one of the companies in which you have an interest, or association, that would reflect equity ... that is value minus liability?

A (Tarver) That is not unusual at all, but where the contingent liability in connection with the equity statement is material, it should be footnoted, and as an example where the liability ... the contingent liability is material, it is good practice to correct, to put a footnote to say that the maker has contingent liability with respect to other obligations, various organizations or partnerships which are reflected ... now that puts the persons who are inspecting the statement on notice that those contingent liabilities do exist and if those contingent liabilities are material relative to the net worth shown.

Q (Terney) Do you know whether or not any inquiry was made by you or Mr. Luttrell as to whether or not the

$77,319.77 was equity as opposed to value without liability?

A (Tarver) I would consider it as equity.

Q (Terney) You did consider it equity?

A (Tarver) I would consider it Mr. Nowell's equity in S & N Farms.

Q (Terney) Then the other side of that coin would be that he also had equity ... that if he had equity? That he would have contingent liability?

A (Tarver) No, that's not true at all ... it's like this, and that's the purpose of the footnote as I said a while ago, that contingent liability exists and to bring us down to this point ... I think a statement that does not reflect at least the existence of liability could be said to have a material omission ...

Q (Terney) Is it unusual for you to have reviewed, in any capacity that you might have, a statement that reflects an interest in a corporation or an asset that the liability is reduced from the value and the contingent liability not reflected?

A (Tarver) I want to know if I understand your statement ... Is it unusual for equity as you state to be net? That is quite often done ... but it is incorrect and it is incorrect ... a simple illustration ... corporation with a million dollars barge and a personal endorsement and the barge is in an accident for the value of this debt, where is the endorsement?

Q (Terney) What you are saying that this is incorrect ... it's an error in the financial statement?

A (Tarver) I think that depending upon the amount of the contingent liability, as it relates to the total net worth, I stated that it can be a negligible omission and error or a very material omission.

To which Mr. Nowell responded under cross-examination:

"Q (Hafter) You say that your interpretation of that is ... that "none", that is that no liabilities is the same thing as $130,000.00 in contingent liabilities?

a (Nowell) I say that I don't consider it $130,000.00 liability until it's owed by me."

Because bankrupt's voluntary petition in bankruptcy was filed herein before the October 1, 1979, effective date of the Bankruptcy Code of 1978, the controlling statutory scheme for the consideration of the issues herein is the Bankruptcy Act of 1898, as last amended prior to the April, 1978, filing date of bankrupt's petition herein.

As of April 19, 1978, section 14(c)(3) of the Bankruptcy Act read as follows:

"(3) while engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation;"

On April 19, 1978, section 17(a)(2) of the Bankruptcy Act read as follows:

"(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another;"

The facts and arguments pertaining to the suggested applicability of section 14(c)(3) present interesting questions. However, under the totality of circumstances herein, this court is of the opinion that a resolution of all of such questions in this case is not necessary because the issues in this case may be appropriately resolved under section 17(a)(2), supra.

On the controverted factual issue of whether or not Mr. Nowell made false representations to Waterways Marine, Inc., as to the extent and value of his personal ownership, as distinguished from that of his wife, of materially substantial assets included in the financial statement, prior to, but for the purpose of obtaining credit and credit extensions by means of oral representations in aid of written representations in the form of the written financial statement and memorandum of personal ownership, this court resolves the issue of credibility of testimony in favor of the testimony of Messrs. Luttrell and Tarver. On the factual question of whether or not Mr. Nowell at a later time admitted to Mr. Tarver that he, Nowell, had dealt dishonorably with Mr. Tarver's company, the court likewise resolves the issue of credibility in favor of Mr. Tarver's testimony. It may be noted that Mr. Nowell did not deny making such statement; he only testified "I don't recall" and "I don't know."

This court chooses to abstain judicially from deciding the question of whether or not the bankrupt should be refused a discharge under section 14(c)(3) of the Bankruptcy Act. This court will proceed to determine the question of dischargeability of the debt represented by the judgment owing to Waterways Marine, Inc., under the following pertinent clause of section 17(a)(2) of the Bankruptcy Act:

"(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations, . . ."

■ Section 17(a)(2), which provides that a liability for obtaining money or property by false pretenses or false representations will not be affected by a discharge, and section 14(c)(3) are not mutually exclusive. "Section 17(a)(2) is broader in scope than section 14(c)(3), which is limited in its application to credit transaction which result from a false statement *in writing*." (Emphasis supplied). 1(A) Collier on Bankruptcy, para. 14.35 at 1380.1. The coverage of section 17(a)(2) is described in 9 Am.Jur.2d, Bankruptcy, para. 1782:

"Any materially false and intentional pretense or misrepresentation which induced the creditor to part with money or property to be repaid or paid for later may serve as the basis for a contention that the liability was not discharged by reason of the exception from discharge of liabilities for obtaining money or property by false pretenses or representations. *The misrepresentation under the first part of the Bankruptcy Act section 17(a)(2)*, as distinguished from the part added in 1960, *need not be in writing* but it must be express and more or less specific, and it must be made either before or at the time of incurring the debt. (Emphasis supplied)

■ A false financial statement, whether wholly in writing or partially in writing or partially in writing and partially oral, given to a creditor for the purpose of obtaining property on credit, constitutes a violation of section 17(a)(2). 8B C.J.S. Bankruptcy, para. 573 at 57–58.

Before the 1960 amendments to the Bankruptcy Act justiciable questions remained as to whether or not an individual bankrupt who had obtained money, property or credit on behalf of his corporation was precluded from obtaining a general discharge under section 14(c)(3) or a release from his provable debts under section 17 by virtue of the underlying question of whether it was the corporation rather than the individual who had obtained the credit on the basis of the individual's financial statement. To overcome this technical obstacle in the language of the statute, there evolved a concept known as the "indirect benefit doctrine", whereby a discharge was not granted to an individual if he had a substantial pecuniary interest in the corporation which received the benefit of credit obtained on his financial statement. This process was somewhat akin to piercing the corporate veil. As stated by the United States Supreme Court in *Levy v. Industrial Finance Corp.*, 256 U.S. 281, 48 S.Ct. 298, 72 L.Ed. 572 (1928):

"We cannot think it possible that the statute should be taken to allow an escape from its words, fairly read, by the simple device of interposing an artificial personality between the bankrupt and the lender".

In 1960, when Congress amended section 14(c)(3) to eliminate the false financial statement as a ground for complete denial of discharge insofar as an individual non-commercial bankrupt was concerned, Congress expressly incorporated the "indirect benefit doctrine" into the statute as a ground for denying a discharge to a businessman who on the basis of either his personal financial statement or a corporate financial statement obtains credit for his corporation. See Senate Report # 1688, 86th Congress 2nd Session (1960). Cited in *In re Flam,* 11 BCD 223, 228 (S.D.N.Y. 1974).

The indirect benefit doctrine applies with equal force to cases arising under section 17(a)(2). *In re Kunkle* 40 F.2d 563 (E.D. Mich.1930); *In re Habib,* 3 BCD 87 (E.D. Penn.1977).

■ This court is of the opinion that the fact that the financial statement was that of an individual as distinguished from its being the financial statement of a corporation does not prevent the application of section 17(a)(2) herein.

Having accepted as credible the testimony of Robert Luttrell and William Tarver as to what happened after the receipt of Nowell's financial statement and personal guarantee and before credit was extended to Lamar Transportation Service, the court finds as follows:

Upon receipt by Luttrell of the guarantee and financial statement, Luttrell mailed a copy of the financial statement to Tarver, who was then the president of Waterways Marine, Inc., and whose responsibility it was to make final decisions on the extension of credit. Tarver and Luttrell then discussed the financial statement, and Tarver, who was concerned as to whether the statement was personal to James Nowell or joint with his wife, instructed Luttrell to contact Nowell to determine exactly what

assets he personally owned. Luttrell then contacted Nowell, who stated by telephone that he personally owned the 50 per cent interests in S & N Farms and in Wilkerson Barge Line shown on the statement of financial condition. During this conversation Nowell discussed the prospects of the S & N Farming venture and elaborated on the market value of the barges owned by Wilkerson Barge Line. The information supplied by Nowell during this conversation confirmed his representation that the balance sheet was "my personal financial statement". Because the original written statement had been confirmed orally in that context, Tarver approved the extension of credit to Lamar Transportation with Nowell's personal guarantee as aforesaid.

■ The undisputed evidence, supra, shows that the preparer of the financial statement responded "none" to the question "liabilities". Specifically, no reference was made either in response to the liabilities question or by footnoting or otherwise as to Nowell's personal contingent liability as an endorser of a corporate indebtedness of S & N Farms to the Federal Land Bank involving a principal balance of approximately $131,267.20. Nowell's attempted justification of such omission on the ground that the obligation was not a personal liability until the corporation defaulted on the note is without merit.

The courts have uniformly held that the omission of a significant contingent liability is a materially false statement which will bar discharge. *In re Fisch,* 180 F.Supp. 45 (E.D.N.Y.1959), affirmed 274 F.2d 822 (2nd Cir.1959); *In re Bebar,* 315 F.Supp. 841 (E.D.N.Y.1970); *Medi-Fund Corp. v. Cross,* 3 BCD 615 (N.D.Calif.1977).

Furthermore, the theory that the omission of liabilities is permitted so long as an equivalent amount of assets is also omitted from the financial statement has long been rejected. *In re Maaget,* 245 F. 804 (S.D.N. Y.1911). In that case the distinguished jurist Learned Hand said, inter alia:

I certainly cannot agree with the proposition that a bankrupt or anyone else may defend a written statement of his finan-

cial condition, merely by showing that the balance is substantially correct ... A merchant is concerned, not only with the net surplus, but with its proportion to the liabilities, and everybody knows that who knows anything about financial statements, personal or corporate.

Under the totality of circumstances in this case, this court finds that James L. Nowell obtained (for his corporation) property by utilizing credit extended on the basis of James L. Nowell's false pretenses and false representations.

Accordingly this court finds that Waterways Marine, Inc., is entitled to have its debt evidenced by the aforementioned summary judgment determined to be non-dischargeable under section 17(a)(2) of the Bankruptcy Act of 1898, as amended.

Judicial abstention will be ordered with respect to the allegations made under section 14(c)(3).

An order will be entered accordingly.