**In re Jesse Howard LONG, Debtor.**

**BARCLAYS AMERICAN/BUSINESS CREDIT, INC., Plaintiff,**

**v.**

**Jesse H. LONG, Defendant.**

**Bankruptcy No. 4–82–1118(O).**

**Adv. No. 4–82–379(O).**

United States Bankruptcy Court, D. Minnesota.

Dec. 14, 1983.

Richard D. Holper, Fabyanske, Svoboda & Westra, St. Paul, Minn., for plaintiff.

James M. Strother, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, Minn., for defendant.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

The above-titled adversary proceeding seeking determination of the dischargeability of a debt under 11 U.S.C. Section 523 came on for trial before the Honorable Kenneth G. Owens on August 30, 1983.

Due to the death of Judge Owens and pursuant to the written consent of the parties, this action is to be decided by the undersigned bankruptcy judge. The court, upon reviewing the transcripts of and exhibits presented at trial, the memoranda submitted by counsel, and all the records and files herein, makes the following findings of fact, conclusions of law, and order.

## FINDINGS OF FACT

1. BABC, the successor in interest to Aetna Business Credit, Inc., (Aetna) commenced this action to bar the discharge of a debt under 11 U.S.C. Section 523 alleging:

(a) That defendant Long committed fraud and defalcation while acting in a fiduciary capacity in violation of 11 U.S.C. Section 523(a)(4).

(b) That Long willfully and maliciously injured the property of BABC in violation of 11 U.S.C. Section 523(a)(6).

(c) That Long obtained money through an extention of credit by false pretenses, false representations, and actual fraud in violation of 11 U.S.C. Section 523(a)(2)(A).

(d) That Long obtained money through an extension of credit by the use of a materially false written statement respecting the debtor's financial condition in violation of 11 U.S.C. Section 523(a)(2)(B).

2. Long acted as President of the A & C Johnson Co. (ACJ) from 1975 through July of 1982 and was an "insider" of ACJ under 11 U.S.C. Section 101(25) at all relevant times from December of 1979.

3. ACJ was a Wisconsin corporation engaged in the wholesaling of wallcoverings and home improvement products. ACJ was a closely held corporation, with 80% of its stock owned by J.H. Long, Inc. The defendant Long was the owner of J.H. Long, Inc.

4. On December 19, 1979, ACJ and Aetna entered into an agreement whereby Aetna was to provide financing to ACJ, and ACJ granted a security interest to Aetna in all ACJ's inventory, accounts receivables, and proceeds thereof. BABC was the successor of Aetna to that agreement.

5. The December 1979 agreement essentially called for BABC to extend credit to ACJ, in the discretion of BABC, in an amount tied to a percentage of the value of the inventory and accounts receivable of ACJ.

6. The December 19, 1979 agreement (Agreement) consisted of at least seven separate documents, many of which contained boilerplate language.

7. One of the Agreement documents, titled "Accounts Receivable Rider To General Loan And Security Agreement," Plaintiff's Exhibit 1, contained a provision calling for ACJ to hold the proceeds of collections of accounts receivable as trustee of an express trust in favor of BABC. To this end, a collateral account was opened at the First Bank of Burnsville, into which all proceeds of ACJ's receivables were to be deposited. BABC then lent ACJ money upon the account.

8. Long was personal guarantor on behalf of ACJ for monies owed BABC.

9. Long, as President of ACJ, was aware of the requirement under the Agreement to segregate funds due BABC but was unaware of the trust relationship. No employee of Aetna or BABC ever expressed to Long that a trust relationship, fiduciary relationship, or express trust existed until after ACJ filed for relief under Chapter 11.

10. In the fall of 1981, ACJ began experiencing financial problems. Long negotiated with BABC for an increased availability of credit.

11. BABC initially extended increased credit, then later, in the spring of 1982, reduced availability of credit to ACJ from a high of 70% of the value of inventory to a low of 50%.

12. Prior to entering the Agreement, ACJ made available to BABC the 1979 year-end financial statements and Accountant's Review Report of ACJ. BABC relied on such documents, at least in part, in determining at what percentage of value of inventory BABC would lend ACJ money.

13. Footnote 3 to the Consolidated Financial Statements reads:

"3. Inventories are stated at the lower of cost or market. Cost is determined principally by the first-in, first-out method."

14. In the fall of 1981, Long purchased for ACJ approximately 30,000 rolls of wallpaper to be used as "road stock" to assist ACJ in marketing its product. The rolls, with a market value of approximately $5.50 each, were purchased at $.50 each, were entered into ACJ's inventory records at a value of $5.50 each, and were entered on the monthly certification reports, submitted to BABC pursuant to the Agreement, at the $5.50 value. BABC was lending at 60% of inventory value at that time.

15. Long, as President and Chief Financial Officer of ACJ, was aware that the amount of credit available to ACJ from BABC was directly linked, at least in part, to the value of ACJ's inventory.

16. Long did not order entry of the 30,000 rolls on ACJ's inventory reports at their $5.50 value, as he believed inventory was "principally" valued at the lower of cost or market. No evidence was introduced to rebut Long's testimony to the effect that due to the huge volume of inventory and large number of different suppliers of ACJ, the company practice was to enter the price paid by ACJ for inventory purchased on discount into the inventory data of ACJ at market value, or current manufacturer's list price, and that often the price shown for specific purchased inventory on the data rolls of the company computer was different from what was actually paid for lots purchased at a discount.

17. As part of the Agreement, ACJ submitted the above-mentioned monthly inventory certification reports portraying the value of the inventory on hand at the end of the month. BABC relied, at least in part, on these reports to determine the amount of credit to extend to ACJ. The inventory reports submitted following the discount purchase of the road stock in November of 1981 reflected the inflated value of that inventory. Approximately $82,000.00 was lent on the inflated value.

18. Long had little or nothing to do with the preparation and submission of the monthly certification reports. All the reports were prepared and submitted by ACJ's controller, either Dale Rosen or David Hughes. No evidence showed that Long ever read those reports or certified their content to BABC.

19. In May of 1982, due to a series of events, ACJ was in a severe financial crisis. Insufficient working capital existed to meet ACJ's current expenses.

20. Long, as President of ACJ, decided to file for Chapter 11 relief. In an attempt to keep ACJ afloat until such relief could be provided, Long authorized the opening of a separate bank account on June 2, 1982.

Proceeds from the mentioned receivables and other monies were deposited into the account rather than being deposited in the BABC collateral account.

21. The stated intent of Long in opening the new account was to make money available in order to pay a retainer to ACJ's attorney to file Chapter 11 and to pay ongoing expenses until the Chapter 11 could be filed. No evidence presented contradicts Long's statement at trial that he believed if the company could carry out a successful reorganization, all creditors, including BABC, would benefit.

22. Approximately $136,240.00 was funneled into and paid out of the new account. With the exception of inadvertent disbursements, all of this money went either to pay current expenses, such as lease payments, utilities, insurance, wages, etc., or to a retainer for filing the Chapter 11. BABC representatives were not made aware of the diversion of funds until after ACJ filed for Chapter 11.

23. ACJ filed for Chapter 11 on June 16, 1982. The case was converted to Chapter 7 on July 1, 1982. Long, as an individual, filed for Chapter 7 relief on June 24, 1982.

## NON-DISCHARGEABILITY UNDER 11 U.S.C. SECTION 523(a)(4)

BABC alleges that approximately $136,240.00 of the debt owed it by the debtor is non-dischargeable under Section 523(a)(4). BABC bases this claim upon the language of the "Accounts Receivable Rider To General Loan And Security Agreement" executed by the parties on December 19, 1979. Paragraph (d) of this document states: "All remittances received by Debtor on account of Accounts shall be held as Aetna's property by Debtor as trustee of an express trust for Aetna's benefit . . . ." In essence, BABC's first contention is that the opening of the First Bank of Burnsville bank account into which the $136,240.00 was deposited in May and June of 1982 constitutes an act, under Section 523(a)(4) of the Code, violating an express trust created in favor of BABC by the

Agreement. Long, as principal and guarantor of the debts of ACJ, would not be discharged for any debts arising from these actions.

Section 523(a)(4) bars discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity . . ." The starting point for analyzing this section is in determining the existence of a fiduciary capacity. Under Section 523(a)(4), such capacity arises only where an "express formal trust" exists. *Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980), *Matter of Dloogoff*, 600 F.2d 166 (8th Cir. 1979) (interpreting Section 17a of the Bankruptcy Act). Mere use of the words "trustee," "trust," or "express trust" does not alone create a fiduciary relationship in the context of Section 523(a)(4). *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891), *In Re Miles*, 5 B.R. 458 (Bkrtcy.E.D.Va. 1980); *Chicago Cutter-Karcher, Inc. v. Maley*, 356 F.2d 456 (7th Cir. 1965), cert. denied, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966). The court will look not only at the language, but at the relationship and acts of the parties to determine whether a trust exists. *Miles*, supra, *In Re Materetsky*, 28 B.R. 499 (Bkrtcy.S.D.N.Y. 1983).

No fiduciary relationship existed here. The only mention of a trust relationship was buried deep in the Receivables Rider, an amending document to a loan and security agreement. It is evident that the parties were in the position of creditor/debtor and not trustee/beneficiary. No separate trust agreement existed and no "true fiduciary responsibilities" were placed on Long. *In Re Crea*, 31 B.R. 239 (Bkrtcy.Mn.1983). Indeed, evidence at trial indicated Long was not aware of the trust language in the Rider, never had it called to his attention by BABC employees, and the trust language was never mentioned to Long until this litigation commenced.

BABC was attempting to insure repayment of the loans made to ACJ by BABC. Such activity is at the very heart of the creditor/debtor relationship and does not create a fiduciary relationship within the meaning of the Code:

"It is abundantly clear that the relationship between the parties in the present case was that of creditor and debtor and nothing else . . . . Verbal legerdemain does not impose a fiduciary duty on the debtor—'the resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust'." *Miles*, supra, citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334, 55 S.Ct.151, 79 L.Ed. 393 (1934).

Neither the use of the words "express trust" nor the existence of a collateral account, into which proceeds from receivables were to be deposited in order to segregate the money from ACJ, alone, nor in conjunction, create a fiduciary relationship where the substance of the relationship between the parties was that of creditor/debtor. *Miles*, supra, *In Re Chambers*, 23 B.R. 206 (Bkrtcy.W.D.Wis.1982). Contra, see *In Re Graham*, 7 B.R. 5 (Bkrtcy.Nev.1980).

"Fiduciary" is a very limited term under the Code. As such, a fiduciary duty is found only where an express trust existed. *Crea*, supra. While it is true ACJ was contractually bound to segregate funds under the various agreements with BABC, a trust relationship was mentioned only in the boilerplate language of the Security Agreement Rider. BABC may have a cause of action for breach of contract, but not for non-dischargeability. No mention of a trust relationship was made in regard to opening the collateral account nor during the course of the arrangement between the parties, such account being merely a funneling and segregation device for the funds due BABC. This was a creditor/debtor relationship, not a fiduciary/beneficiary relationship as envisioned in Section 523(a)(4). This result is consistent with a narrow interpretation of "fiduciary" under Section 523(a)(4) and with the narrow construal of exceptions to discharge. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Neither Long nor ACJ was acting in a fiduciary capacity with respect to BABC as that capacity is defined under Section 523(a)(4).

Therefore, the $136,240.00 channeled away from the collateral account is not barred from discharge under Section 523(a)(4). Since no fiduciary relationship existed, no discussion of fraud or defalcation under Section 523(a)(4) need be made.

## NON-DISCHARGEABILITY UNDER 11 U.S.C. SECTION 523(a)(6)

■■■ BABC challenges the $136,240.00 diversion for a second reason. The claim is that the $136,240.00 is non-dischargeable under Section 523(a)(6): "for willful and malicious injury by the debtor to another entity or to the property of another entity; ..." 11 U.S.C. Section 523(a)(6). BABC here argues that the opening of the separate account at the First Bank of Burnsville by ACJ at the direction of Long and the diversion of funds from the BABC account to the new account constituted a conversion of BABC's property and thus bars the discharge of the $150,000.00 under Section 523(a)(6).

Conversion is one type of injury to the property of another envisioned in Section 523(a)(6). *In Re Hodges*, 4 B.R., 513, 516 (Bkrtcy.W.D.Va.1980); *In Re Simmons*, 9 B.R. 62 (Bkrtcy.S.D.Fla.1981). A conversion occurred here, at least a conversion in the technical sense of the word. Money which contractually belonged to BABC was diverted from their control and into the hands of ACJ. That the money converted did not inure directly to the debtor here is not important. Depriving BABC, through unauthorized action, of its rights in the property, permanently or for a definite period of time, constitutes conversion. BABC must prove, therefore, by clear and convincing evidence that Long willfully and maliciously converted BABC's property.

No controversy exists as to the willful nature of the debtor's acts. With full knowledge of the secured status of BABC and ACJ's contractual duty to segregate funds, Long intentionally and deliberately caused to be opened an account to which funds rightfully belonging to BABC were funneled. The essential element is whether Long acted "maliciously."

Determination of the state of mind of an individual is done on a case-by-case basis. The facts of the case must be applied to the standard of malice applied by the courts. The Supreme Court has determined that malice in the context of Section 523(a)(6) entails "an intent to harm" the creditor. *Davis,* supra. As the court stated in *In Re Pommerer,* 10 B.R. 935, 940 (Bkrtcy.D. Minn.1981):

"A malicious conversion envisions a tort with aggravating features which warrant a deduction that the act transcends a minimal or technical wrongdoing and evinces a willingness to voluntarily inflict injury."

This "willingness to voluntarily inflict injury" need not entail personal animosity nor a specific intention to cause damage to the particular person or thing injured. Maliciousness arises from an unlawful and wrongful act done intentionally without legal justification or excuse. *In Re La Casse,* 28 B.R. 214, 218 (Bkrtcy.D.Minn. 1983). In *La Casse,* this court found non-dischargeable the debt arising from the firing of a shotgun into the property of another when such action was done intentionally and deliberately and where the debtor "knew" the injury would result.

In *Pommerer,* supra, applying the "unlawful and wrongful" standard, the court found non-dischargeable the debt arising from the debtor's sale of cattle subject to a security interest and subsequent use of the funds of sale to feed debtor's family and to fund the continued operation of debtor's farm. The court there noted its incredulity at debtor's contention that he was totally oblivious of his creditor's secured status. The court then went on:

"This (decision to sell the security and reapply the proceeds) ..., was not solely his decision to make, and it involves a deliberate and intentional plan made with knowledge and with appreciation that if it succeeded he would benefit, and if it failed, plaintiff (creditor) would suffer, but he would be no worse off .... It evidences a willingness to inflict harm on another on the off-chance that he could

benefit himself." *Pommerer,* supra, at 941.

This language from *Pommerer* highlights the difference between that case and the present one. In *Pommerer,* the debtor converted the property of the creditor with intent to benefit only himself if the plan succeeded and to place the creditor alone at risk if his plan failed. Here, while there is no legal excuse for Long's acts, neither were they malicious. Long's testimony is uncontradicted in that his sole purpose in diverting the funds was to enable his struggling company to reorganize and thus benefit all involved: himself, BABC, and all creditors. BABC was not alone put at risk by his actions, either. The financing arrangement between the parties placed Long in the position of guarantor of all the debts of ACJ. Should ACJ not be able to reorganize, Long became personally liable for those debts. As such, his actions placed the risk equally on himself as well as BABC. That the result was injury to both Long and BABC is not relevant. Long's intention at the time of his acts is the key; and this court, under the present facts, cannot say that this was a malicious conversion.

That the converted funds were used by and large to pay creditors supplying essential services to the debtor is further evidence of no malice. This further distinguishes this case from *Pommerer.* Here, had the monies not been paid to the supplying creditors, essential services may very well have been halted, thus forcing a premature shutdown of the business and resulting in injury to all involved. BABC was in the process of working down the balance of the loan, consequently propelling ACJ to a crisis financial situation. No such showing was made in *Pommerer.* Other courts have discharged such debts in similar factual settings of conversion of secured property. See *In Re Langer,* 12 B.R. 957 (D.N.D.1981), and the cases cited therein. The creditor here has failed to show, on these facts, that the debtor acted maliciously or with intent to harm BABC. Therefore, Section 523(a)(6) of the Code has not been satisfied in relation to the converted funds and Long is not barred from discharge of this debt by that section of the Code.

## DISCHARGEABILITY UNDER 11 U.S.C. SECTION 523(a)(2)(A)

The plaintiff next seeks non-dischargeability of $82,000.00 of the debt owed it by the debtor. This claim arises from the amount of credit extended by BABC to ACJ over and above the amount which would have been extended had the debtor and ACJ not used false pretenses and actual fraud (Section 523(a)(2)(A)) in overstating the value of the inventory of ACJ in late 1981.

BABC asserts that ACJ's use of false values in its monthly inventory certification reports to BABC in relation to the cost/market value of the 30,000 rolls of "road stock," to show a market value of $5.50 rather than a cost of $.50, was fraud and false representation, thus rendering the debt created by the overvaluing non-dischargeable under Section 523(a)(2)(A).

BABC must prove, by clear and convincing evidence, the following facts:

(a) The debtor made false representations of fact to the creditor;

(b) The debtor knew the representations of fact were false or were made without knowledge of their truth or falsity;

(c) The debtor intended to induce the creditor to rely upon the misrepresentations, and;

(d) The creditor relied upon the misrepresentations to his or her detriment.

It is the duty of the creditor seeking to establish non-dischargeability to show essentially that the debtor acted with intent to deceive the creditor and that the creditor relied to his detriment upon assertions by the debtor.

## INTENT UNDER SECTION 523(a)(2)(A)

BABC did not establish the requisite deceitful intent on the part of Long. BABC's contention that the 1979 year-end statements, erroneous monthly inventory certification reports, and failure of Long to

correct any discrepancies, taken in conjunction, constitute false pretenses, false representations, or actual fraud under the Code is not supported by the evidence.

The 1979 year-end financial statements were not prepared by ACJ, but by an outside auditor. Long had little or nothing to do with the preparation of the statements. Long testified, as to the relevant footnote $3, that it was his belief that inventory was "principally" valued at lower of cost or market rather than strictly valued by that method. That his belief was in contrast to that of the representatives of BABC and not in strict adherence to the wording of the footnote is not enough to raise the later allegedly fraudulent actions to the standard required under Section 523(a)(2)(A).

The submission of the "erroneous" monthly certifications and subsequent failure to "correct" those certifications were neither false nor fraudulent when examined in the light of the unrebutted testimony of Long. ACJ's computer system was not sufficiently adaptable to allow changes for every purchase of inventory at discount. Since ACJ did not adjust normally for such discount purchases, failure to adjust its inventory reports here could not lead to a conclusion that a debt arising from any discrepancy should be non-dischargeable. No fraudulent intent on the part of ACJ or Long has been shown; especially it has not been shown by clear and convincing evidence. Therefore, Section 523(a)(2)(A) does not bar dischargeability of the debt of Long as guarantor of ACJ.

The parties here disagreed as to inventory valuation. The footnote to the financial statement was hardly a false representation, nor was any concealment established by Long's failure to put both parties on the same wavelength. Long was not an accountant and his testimony that the usual method of valuing inventory purchased at discount at the manufacturer's list price was rebutted only by the testimony of Thomas Carignan that someone told him inventory was valued at the lower of cost or market. No false representation or fraud is shown where the party making the representations, or failing to make them, did not think they were false. No intent to deceive has been shown.

### DISCHARGEABILITY UNDER 11 U.S.C. SECTION 523(a)(2)(B)

The next section of the Code under which to analyze the present factual situation is Section 523(a)(2)(B). Under Section 523(a)(2)(B), a discharge is barred for a debt arising from:

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

In analyzing this section, it is first incumbent on the court to address the defense raised by Long that he did not personally receive money or credit through the submission of the 1979 financial statements or through the submission of the monthly inventory certification reports. Long was President, Chief Financial Officer, and 80% owner of ACJ. As such, he had a substantial financial stake in ACJ. The cases are many which hold that a discharge may be barred for a debt incurred on behalf of a corporation through the use of financial statements supplied by an individual with a substantial financial interest in the corporation. See *Levy v. Industrial Finance Corp.*, 276 U.S. 281, 48 S.Ct. 298, 72 L.Ed. 572 (1928); *In Re Nowell*, 29 B.R. 59 (Bkrtcy.N.D.Miss.1982). This is even more so where the debtor was a personal guarantor of the corporate obligations. Therefore, Long's debts on behalf of the corporation may still fall under the purview of Section 523(a)(2)(B).

BABC argues that Long submitted materially false financial statements, in the form of overvalued monthly inventory certification reports, with the intent of deceiving BABC into extending more credit to ACJ than would have been granted under an accurate statement of the inventory value.

It is clear that inaccurate written statements were submitted by someone within ACJ respecting the financial condition of the company, inaccurate at least to BABC's interpretation of the 1979 year-end financial statements. The statements were incorrect in that the road stock was valued at $150,000.00 when it should have been valued at $15,000.00. BABC claims it lent approximately $82,000.00 to ACJ over and above what it would have lent on the basis of these reports and the 1979 financial statements declaring inventory was valued at the lower of cost or market. This is hardly immaterial, even in the face of a $1,400,000.00 total inventory.

### RELIANCE BY BABC

The monthly inventory certification reports were but one of many sources of data upon which BABC valued inventory in order to extend credit. Others included the year-end physical inventory, reports by Jeffrey Reed, BABC's loan officer responsible for ACJ, and periodic spot audits. The monthly reports were the primary source of information, however. Reliance on the reports was also reasonable under these facts. To require BABC to maintain a constant ongoing audit of the physical assets of its obligors would be commercially unreasonable, especially in dealing with a debtor whose inventory includes several thousand rolls of wallpaper. Where the debtor, as here, maintains a computer business system controlling its inventory, reliance upon the inventory reports is not unreasonable, especially where adjustments are made yearly through physical inventories to adjust any digressions from the monthly totals. Under 11 U.S.C. Section 523, reliance need not be total reliance. Partial reliance is sufficient if the financial condition statement, here the inventory certifications, forms a substantial part of the relied upon information. *In Re Rodriguez*, 29 B.R. 537 (Bkrtcy.E.D.N.Y. 1983).

In addition to being reasonable, the reliance by the injured party must be to that party's detriment for the debt created by that reliance to be held non-dischargeable under Section 523(a)(2). BABC must prove that they were damaged by the "false" statements regarding inventory value submitted by ACJ. Here, that detrimental reliance has not been established.

BABC was concerned with the value of ACJ's inventory, not as the inventory would be valued by a going concern, but rather as it would be valued by a liquidating creditor. As Thomas Carignan testified at the trial:

"Q Now, Mr. Carigan, why are percentage limitations established on inventory in your business?

A Well, percentage limitations usually relate to the liquidation value of the collateral.

Q Well, is your lending then governed by what you, Barclays, ultimately feels you can obtain if you have to liquidate the collateral?

A Yes."

Testimony of Thomas Carignan (T.T. pgs. 21–22). Other testimony and evidence also support the conclusion that BABC was concerned with the liquidation value of the inventory of ACJ.

The purpose of the monthly certification reports was to give BABC a continuous flow of information regarding the value of ACJ's inventory. As BABC was examining this data with an eye on eventual liquidation value, the purchase price of the inventory was at least as fair a representation of that liquidation value as would be a representation based upon the cost of the inventory. Testimony at the trial shows that liquidation value was determined by cost, market value, obsolescence, and various other factors. As such, the reports submitted were, for liquidation of collateral purposes, not damaging to BABC as they accurately represented what BABC sought—a value level of inventory sufficient to allow BABC to recover its investment in ACJ upon liquidation. This is especially true when the percentage of inventory lent upon could be altered as BABC saw fit. BABC established the percentages of lending as a ceiling rather than a floor, and

BABC had discretion under the Agreement to lend an amount less than the ceiling at any time during the course of dealing between the parties. Thus, I cannot say the secured creditor here was truly damaged by its reliance on the reports submitted by the borrower.

### SECTION 523(a)(2)(B)(iv)

 As is often the case in this type of situation, the creditor's most difficult task is proving the debtor published the relied upon data with the intent to deceive.

It is evident Long did not directly publish the reports. They were prepared and submitted by the controller of ACJ. Long did make the purchases, knew the terms thereof, and knew credit was extended based on the valuation of the inventory. However, the requisite intent under Section 523(a)(2)(B) is not present.

Intent is inferred from facts. In this setting, BABC must prove that Long knew the statements were false or were made with reckless disregard for the truth amounting to willful misrepresentation. There must be an intent to deceive. This element is intertwined with the falsity element under Section 523(a)(2)(B)(i).

The court is not convinced that such a showing was made. Long testified that it was company practice for ACJ, when buying inventory at a discount, to enter on their books the manufacturer's list price for that item. The nature of their computer equipment was such that changes could not be entered for each discount purchase.

Long testified that he had read the footnote in the 1979 financial statement and that it was his impression that the footnote stated inventory would principally be valued at cost or market. The footnote actually states: "Inventory is valued at the lower of cost or market. Cost is determined principally by the first-in, first-out method." Plaintiff's Exhibit 2, p. 9.

While Long's interpretation of those sentences may have been incorrect, no evidence introduced suggests that his interpretation did not accurately reflect the way ACJ did business. Thomas Carignan testi-fied that either Long or Rosen told him that lower of cost or market was used, but Carignan did not know which person told him. In any event, it is clear that his actions here were not done with the intention of deceiving BABC. The most that can be said is that a footnote in a year-end financial statement led to a disagreement concerning the method for valuation of inventory. Indeed, Thomas Carignan of BABC testified that he talked with Long in April of 1982 concerning the workdown of the loan balance. His testimony was that he then understood he and Long were talking about the inventory in differing contexts; Carignan in terms of its liquidation value and Long in terms of its value to an ongoing concern. Entry of the road stock at manufacturer's list price would be consistent with valuing the inventory as it relates to an ongoing concern rather than as to a liquidation.

The valuing of the discount road stock at its manufacturer's list price, rather than its cost, was consistent with Long's view of the company's inventory practice. As such, it can hardly be said that he made the statement knowing it was false or with such reckless disregard for the truth as to amount to a willful misrepresentation. No intent to deceive has been shown. Therefore, Section 523(a)(2)(B) does not bar discharge of the debt.

## CONCLUSION

1. The opening of a collateral account by ACJ at the direction of Long, into which money contractually belonging to BABC was deposited and later disbursed, does not give rise to non-dischargeability under Section 523(a)(4). No fiduciary capacity or true trust arrangement was shown.

2. The diversion of the funds to the new account was at most a technical conversion. No malicious injury to BABC's property has been established. No "intent to harm" BABC was shown, as Long used the diverted funds in attempting to gain a successful reorganization, thus benefiting all creditors, including BABC. Therefore, 11

U.S.C. Section 523(a)(6) does not bar discharge of this debt.

3. The elements of Section 523(a)(2)(A) also were not established here. No intent to deceive has been shown in submission of and failure to correct "erroneous" inventory certification reports.

4. The elements of 11 U.S.C. Section 523(a)(2)(B) also were not established. No fraudulent intent or intent to deceive on the part of Long has been shown. Therefore, that debt is not barred from discharge by Section 523(a)(2)(B).

THEREFORE, IT IS ORDERED that the above-mentioned debts of Jesse Long to BABC are herein discharged under 11 U.S.C. Section 727.