In re Jerry R. ALSPACH, Debtor.

Janet CONIBEAR, individually and as a shareholder of PGP, Inc., Plaintiff,

v.

Jerry R. ALSPACH, Defendant.

Bankruptcy No. 82–03014 T.
Adv. No. 83–0300.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 12, 1987.

Alfred W. Crump, Jr., Reading, Pa., for debtor.

Jonathan L. Wesner, Reading, Pa., for plaintiff.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Before this court is a complaint to determine the dischargeability of a debt. The plaintiff, Janet Conibear, asserts a claim against the debtor, Jerry R. Alspach, in his capacity as an officer of PGP, Inc. The plaintiff invested the sum of $8,212.24 for the purchase of stock of the aforementioned corporation, of which the debtor was vice president. The plaintiff alleges that the debtor, either by himself or in conjunction with Marvin Julius, the president of PGP, Inc., made numerous materially false representations upon which the plaintiff relied in making her decision to purchase stock in PGP, Inc. The plaintiff also asserts that some or all of the money was converted to the personal use of the debtor. The debtor contends that he was as much a victim of the company president as the plaintiff, that he received little in the way of compensation from PGP, Inc. and that he was unwittingly drawn into cashing checks for the company president. This court finds that the defendant intentionally and knowingly made false statements and false representations to the plaintiff. We hold that pursuant to 11 U.S.C. § 523(a)(2)(A), the sum of $8,212.24 invested by the plaintiff in PGP, Inc. at the inducement of the defendant, is a debt of the defendant and is nondischargeable.

PGP, Inc. is a now defunct insurance agency, the officers of which were Marvin Julius, president, Jerry Alspach, vice president and C.J. Binscoter, vice president. During July of 1981, plaintiff was contacted by a salesperson from PGP, Inc. regarding a program designed to reduce mortgage payments through the use of life insurance and annuity growth. The plaintiff expressed some interest in becoming involved in the company and was invited to a meeting on August 3, 1981. At said meeting and subsequent meetings, the defendant and the president of PGP, Inc. made numerous representations regarding many aspects of PGP, Inc. These representations include statements regarding, *inter alia:* the value of the company, both present and future; the value of company stock, both present and future; the number of outstanding shares of stock; the number of shares owned by each principal; the ability and intention of PGP, Inc. to obtain a seat on the stock exchange; the membership of the president of Hamilton Bank on the board of directors; the number of

states in which PGP, Inc. operated; the number of new offices to be opened in the ensuing year; the value and ownership of a computer and other office machinery. On September 21, 1981, relying upon the representations of the defendant, the plaintiff purchased 20 shares of corporate stock for the price of $250.00 per share.[1] Said stock was never issued. On November 6, 1981, relying on further representations of the debtor that the stock had increased in value and that additional money was being invested by another party, the plaintiff purchased 15 more shares of PGP stock for $3,750.00.[2] On or about November 15, 1981, the plaintiff became aware of information which led her to believe that PGP, Inc. had financial problems and that salesmen's commissions were not being paid in a proper fashion. On December 14, 1981, the plaintiff found out that PGP was having trouble with Fortune National, the company that wrote the insurance policies for PGP. The plaintiff subsequently was told that the president, Marvin Julius, had gone to Florida to attend his mother's funeral. Mr. Julius never returned. Only three months after the plaintiff was induced to invest in PGP, Inc., the company ceased operating.

The evidence in this case clearly indicates to this court that the representations made to the plaintiff were false and misleading. In particular: the net worth of PGP, Inc. was grossly overstated; the value of PGP, Inc. stock was grossly overstated, such stock was never going to be issued to the public and PGP, Inc. never had sufficient assets to declare stock dividends; Hamilton Bank's president was not going to become a director; the corporation never had sufficient net worth to open any offices other than Wilkes Barre and never had sufficient net worth, business or assets to effectuate any of the other corporate purposes represented by the debtor; the computer was not the property of PGP, Inc. but in reality was owned by Fortune National Life Insurance.

The debtor argues that he was as much a victim of the president, Marvin Julius, as the plaintiff. We do not find this to be so. The debtor suggests to this court that he was not involved in the financial end of the business. The evidence in this case leads us to a different conclusion. Between July 1, 1981 and January 6, 1982, four hundred and sixty-six checks were written on the PGP, Inc. account. Two hundred and ninety-one of these were signed by the debtor. Also between July 1, 1981 and December 23, 1981, the debtor wrote to himself thirty-one checks totaling a sum of $10,865.06. Additionally, he received a check for $2,500.00 signed by himself and Marvin Julius. The debtor testified that he did not take a salary for the services performed for PGP and was only reimbursed for expenses (N.T. at 13). The debtor later testified that although he had gotten some checks he had "... held them ..." and that he had not received any money out of the company after the plaintiff became involved. Again, the debtor's testimony is contradicted by the evidence. The plaintiff's first deposit to PGP was September 29, 1981, and of the thirty-one checks the plaintiff wrote to himself, twenty-two of them totaling $7,610.30 were cashed after that date. Three other checks made out to the debtor by PGP were cashed after September 29, 1981.[3] The evidence in this case [4] clearly indicates that the debtor was involved in and had knowledge of the financial workings and situations of PGP, Inc.

The question presented to this court is whether the debtor is guilty of committing actual fraud or making false representations and/or false pretenses within the

1. The plaintiff paid $4846.11, by check and received a credit for $159.89 which represents partial credit for commission on a policy issued to Jimmy Conibear.

2. The Plaintiff paid $3,366.63, by check and received a credit for $383.37, which represents the balance of the commission earned on a policy issued to Jimmy Conibear.

3. The records show that the debtor cashed 2 checks in September before the plaintiff's contribution and 12 checks were deposited shortly after the plaintiff made a substantial contribution.

4. Copies of PGP, Inc. checks signed by and/or made out to the debtor.

meaning of 11 U.S.C. § 523(a)(2)(A) so as to create a debt which is nondischargeable. We find that the debtor is guilty of the acts described in Section 523(a)(2)(A). Section 523 lists exemptions to discharge. Such exemptions include, *inter alia:*

(a) a discharge under ... this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). In order that a debt may come within the present exception, money (among other things) must actually have been obtained by false pretense or representation or by means of actual fraud. *Rudstrom v. Sheridan*, 122 Minn. 262, 142 N.W. 313 (1913). The debtor, in the case at hand, actually received money as a result of the plaintiff's relying on his representations by way of the PGP checks cashed after the date upon which the plaintiff made her contributions. Also, *3 Colliers on Bankruptcy*, 523–39 (15th ed. 1986), states, "the better view seems to be that it is not necessary that property be actually procured for the debtor himself. *In re Howell*, 29 B.R. 59 (B.Ct.N.D.Miss. 1982). It can not be disputed that PGP, Inc. received money from the plaintiff as a result of the debtor's representations.

Next, it is important to note that not all frauds are included under Section 523(a)(2)(A). The types of fraud which are included are those which involve moral turpitude or intentional wrong.[5] This court finds that the debtor, by his actions and statements, intended to defraud and mislead the plaintiff. The debtor's participation in creating false pretenses and in giving false representations regarding the financial status of PGP Inc. is the type of fraud included under Section 523(a)(2)(A). Pursuant to the Code, these representa-

tions must have been made knowingly and fraudulently and must have been relied upon by the other party. *Green v. Geyin, (In re Geyen )*, 11 B.R. 70, 4 C.B.C.2d 623 (B.C.W.D.La.1981). We find that the debtor created false pretenses and made false representations through his actions and in his omissions. The debtor knowingly made false statements regarding PGP, Inc. and verified the truth of false or misleading statements made by others in an effort to and with the intent to defraud the plaintiff. The plaintiff reasonably relied upon the statements of the executive vice president and president of the company. Such reliance caused the plaintiff to invest $8,212.24 in worthless stock. Pursuant to 11 U.S.C. § 523(a)(2)(A), this court finds that the sum of $8,212.24 was fraudulently obtained by the debtor from the plaintiff. We hold that said sum is not discharged.

An appropriate order will follow.

---

5. This is distinguished from the fraud implied in law which may exist without imputation of bad faith or immorality.