**In re Jack Franklin McCOY, Debtor.**

**Commercial Bank & Trust Co., Plaintiff,**

v.

**Jack Franklin McCoy, Defendant.**

**Bankruptcy No. 01–10227.**
**Adversary No. 01–5085.**

United States Bankruptcy Court,
W.D. Tennessee,
Eastern Division.

Nov. 5, 2001.

J. William Phillips, Murray, KY, for debtor.

Brad Sigler, Jackson, TN, for plaintiff.

## MEMORANDUM OPINION AND ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY

G. HARVEY BOSWELL, Bankruptcy Judge.

The Court conducted a trial in this matter on September 26, 2001. FED. R.BANKR.P. 7001. Pursuant to 28 U.S.C. § 157(b)(2), this is a core proceeding. After reviewing the testimony from the trial and the record as a whole, the Court makes the following findings of facts and conclusions of law. FED.R.BANKR.P. 7052.

### *I. FINDINGS OF FACT*

On April 29, 1999, the plaintiff in this matter, Commercial Bank and Trust, loaned the debtor, Jack McCoy, the sum of $25,000.00. According to the loan documents and the testimony of the parties, the proceeds of this loan were to be used to purchase horses. The debtor granted Commercial Bank a "purchase money security interest in all horses/livestock located at, 335 Cowpath Road, Buchanan, TN, property being owned by the debtor Jack McCoy II, including all now owned or herein hereafter acquired livestock and all offspring." In accordance with this security interest, Commercial Bank filed a UCC–1 Financing Statement on April 29, 1999, in Henry County, Tennessee. The note originally matured and was due on April 28, 2000, but was renewed and extended for an additional year at that time.

According to the testimony of Robert Newcomb, the loan officer who made the loan to the debtor, the debtor had informed the bank that he wanted to purchases horses from "up north" and that part of the loan proceeds would be used to transport the horses to Tennessee. The debtor testified that he had told the bank that part of the proceeds would be used to build additional stalls for the horses and that, prior to applying for the loan, he had located four horses in Michigan to purchase for $8,000.00. Newcomb testified that he did not recall being informed of the stall construction or that the debtor had specific horses in mind when he applied for the loan. Had the bank been informed of those horses, Newcomb stated that the security agreement between the parties would not have been an open-ended one.

Prior to entering into the April 29, 1999, loan with the debtor, Newcomb had personally known McCoy for approximately eighteen months. Newcomb had dealt with McCoy on other loans all of which were handled satisfactorily. At the time of making this loan, Newcomb knew that McCoy was employed by the Dana Corporation and that his monthly salary was $3,750.00. Newcomb also knew that McCoy owned his house.

The proceeds of the April 29, 1999, loan were directly deposited into McCoy's per-

sonal checking account with Commercial Bank. According to Commercial Bank's records, McCoy made the interest payment on the April 29th loan every month through May 2000. After that time, the interest payments began to get past-due. Newcomb called McCoy to inquire about the payments. For a few months, McCoy would make a payment to catch the loan up; however, after a few months, the payments once again ceased. Sometime in the late summer of 2000, the loan became more than 60 days past due. Newcomb again called McCoy. When questioned about the severe delinquency of the loan, McCoy informed Newcomb that he was having difficulties with his son and that he was trying to sell his house. Newcomb suggested that McCoy sell the horses and remit the proceeds to the Bank. According to Newcomb, McCoy told him that he had already sold the horses. McCoy denies having told Newcomb this. McCoy made a lump sum payment of $600.00 on September 15, 2000, and a lump sum payment of $500.00 on December 15, 2000. These payments brought the loan current through October 2000. Sometime after the December 15th payment McCoy informed Newcomb that he was anticipating having to file bankruptcy.

After receiving the notice of McCoy's bankruptcy, Commercial Bank charged off McCoy's loan. The balance of the note, as of the trial date, was $27,232.13. According to Newcomb's testimony, McCoy did not inform Commercial Bank that he had not purchased the horses until the § 341 meeting of creditors.

At the trial in this matter, McCoy adamantly testified that at the time of entering into the loan agreement with Commercial Bank, he had every intention of using the loan proceeds to purchase horses and that he did use $2,500.00 of the proceeds to build stalls for the horses. No proof of this construction was presented to the Court although the debtor alleged that a $2,000 check made out to "Cash" was used to pay for the stalls.

Despite his intentions to use the proceeds to buy horses, McCoy testified that several unforeseeable circumstances arose which necessitated his using the money for other things. The Court feels it is important to point out at this juncture that McCoy did not recall the exact dates of any of these "mishaps," nor did he present any supporting documentation to the Court as evidence of them, but he knew without a doubt that they occurred after receiving the loan.

The first unforeseen circumstance which confronted McCoy after receiving the loan proceeds was that the fuel pump and the transmission on his 1994 Ford F150 pickup truck went out. A check to Joe Mahan Ford in the amount of $737.80 cleared McCoy's checking account at Commercial Bank on May 3, 1999. This check was for repairs to the Ford truck. Sometime after these repairs, McCoy's Ford truck broke down again. At this point, McCoy felt he needed a new vehicle. McCoy used $9,633.84 of the proceeds to pay off Security Bank's lien on the 1994 Ford. McCoy's check for this payoff cleared his checking account on May 27, 1999. McCoy traded the lien free Ford in on a three year lease of a 1999 Z71 pickup truck. McCoy could not recall how much credit he was given for the 1994 Ford at the time of the trade. According to his own testimony, McCoy will not be able to afford to purchase the Z71 at the end of the lease term.

The second unforeseen circumstance which confronted McCoy after receiving the loan proceeds was the need for a new heat pump/air conditioning unit at his home, as well as the need for a new roof. The heat pump/air conditioning unit cost $3,500.00 and was purchased sometime in

July or August 1999. The roof was replaced around this same time and cost approximately $2,500.00. Incidentally, the roof leak led to the collapse of a ceiling in one of McCoy's bedrooms. The repair of this damage cost $500.00. McCoy did not file an insurance claim for the ceiling damage or the roof.

The third unforeseen circumstance that McCoy confronted was the need for furniture at his home. When he and his ex-wife divorced in 1998, she took all the furniture with her, leaving McCoy's house empty. According to McCoy's testimony, his children kept asking him when they would be getting furniture for the house. At some point in May 1999, McCoy "couldn't take it anymore" and bought $1,800.00 worth of furniture from Williams Furniture. McCoy's check for this purchase cleared his checking account on May 18, 1999.

The fourth unforeseen circumstance to confront McCoy were several large telephone bills in the "$300 – $400 range." McCoy testified at the trial that his children had hidden one of the bills from him and that he had no idea he had those kind of phone bills when he applied for the loan at Commercial Bank. A check to Bellsouth in the amount of $622.81 cleared McCoy's checking account on April 20, 1999. Another check to Bellsouth in the amount of $512.03 cleared McCoy's account on May 18, 1999.

The fifth unforeseen circumstance which confronted McCoy was the unstable mental health of his son sometime in "May or June, July or August" of 1999. After an altercation at the school during which other students were threatened, McCoy's son was suspended and sent to alternative schooling. McCoy's son was eventually hospitalized for ten days in Union City, Tennessee. Insurance only paid for 20% of the healthcare of McCoy's son. When speaking about these events, McCoy did not mention any dollar amounts he was required to pay for his son's care.

In addition to the amounts mentioned above, McCoy's checking account statements reflect the following: (1) A check to the IRS in the amount of $1,008.00 cleared on April 29, 1999; (2) a check made out to "Cash" in the amount of $2,000.00 cleared on May 5, 1999; (3) a $150.00 withdrawal on April 28, 1999; (4) a $400.00 withdrawal on May 3, 1999; (5) another $400.00 withdrawal on May 3, 1999; (6) a $200.00 withdrawal on May 24, 1999; (7) a $100.00 withdrawal on May 28, 1999; (8) a $400.00 withdrawal on June 3, 1999; (9) a $50.00 withdrawal on June 11, 1999; (10) a $200 withdrawal on June 14, 1999; and (11) a $250.00 withdrawal on June 17, 1999. According to these transactions and the transactions mentioned previously, McCoy had spent approximately $20,000 of the loan proceeds within 30 days.

When questioned by Commercial Bank's attorney at the trial, McCoy admitted that he knew he signed documents at the bank saying he was going to purchase horses. He also admitted that he knew that the bank assumed he had purchased horses. He also admitted not telling the bank that he did not purchase any horses until the § 341 meeting of creditors. When asked why he did not tell the bank about the unforeseen circumstances and why he did not give the loan proceeds back to the bank, McCoy testified that his intent was to always pay the money back. After spending the loan proceeds on other things, McCoy had hoped to be able to sell his house and repay Commercial Bank.

## II. CONCLUSIONS OF LAW

■ Section 523(a)(2)(A) excepts from discharge any debt:

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). In order to have a debt declared nondischargeable pursuant to this section, the creditor must prove (1) the debtor made a material representation, (2) the debtor knew the representation was false at the time of making it, or made the representation with gross recklessness as to the truth, (3) the debtor made the representation with the intention of deceiving the creditor, (4) the creditor justifiably relied upon such representation, and (5) the creditor sustained loss and damage as the proximate result of the representations. *In re McLaren,* 3 F.3d 958 (6th Cir.1993); *Brady v. McAllister,* 101 F.3d 1165, 1172 (6th Cir.1996).

▪ The terms "false pretenses," "false representation" and "actual fraud" are not defined by the Bankruptcy Code. As a result, courts have had the responsibility for setting their boundaries. In the case of *Field v. Mans,* the U.S. Supreme Court held that the terms used in § 523(a)(2)(A):

> ... carry the acquired meaning of terms of art. They are common law terms, and ... in the case of "actual fraud," ... they imply elements that the common law has defined them to include.

*Field,* 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995). In following the Supreme Court mandate announced in *Field v. Mans,* all courts have unanimously held that, as used in § 523(a)(2)(A), "[a]ctual fraud involves moral turpitude and does not include fraud implied in law which may exist without imputation of bad faith or intentional wrong." *In re Pommerer,* 10 B.R. 935, 939 (Bankr.D.Minn.1981). For a creditor to succeed in excepting a debt from discharge, the debtor must have engaged in some conduct which can be fairly said to be "blameworthy." *In re Anderson,* 181 B.R. 943, 948 (Bankr. D.Minn.1995).

▪ The second and third elements of a § 523(a)(2)(A) claim, those being the nature of the debtor's representations, are somewhat more troublesome for a creditor to prove. It is often difficult to determine a debtor's true intent. No debtor is going to get on the stand and admit to fraudulent intent. As a result, "plaintiff may present evidence of the surrounding circumstances from which intent may be inferred." *Van Wert Nat'l. Bank v. Druckemiller,* 177 B.R. 859, 861 (Bankr.N.D.Ohio 1994), citing *Matter of Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987). This type of proof necessarily includes deciding who is the more credible witness.

▪ The level of reliance which a creditor must prove in a false representation action was established · by the Supreme Court case in *Field v. Mans.* This case changed the level of reliance in § 523(a)(2)(A) actions from a reasonable one to a justifiable one. *Field,* 516 U.S. at 73, 116 S.Ct. 437. As a result, the Supreme Court stated that an inquiry of a creditor's reliance is a subjective one which depends on the facts and circumstances of each case. Under this standard, a creditor will be found to have justifiably relied on a representation even though "he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70, 116 S.Ct. 437. [Citing Restatement (Second) of Torts § 540 (1976)].

▪▪ The creditor bears the burden of proof in a § 523(a)(2)(A) action and must prove the necessary elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112

L.Ed.2d 755 (1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir.1994). This approach is thought to further the well-espoused bankruptcy policy of granting the honest, but unfortunate debtor a fresh start in bankruptcy. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

■ In the case at bar, there is no question that McCoy made a material representation to Commercial Bank & Trust. McCoy induced the Bank to loan him $25,000.00 for the sole and express purpose of purchasing horses. This was not a general unsecured loan. This was a purchase money security loan with the Bank retaining property rights in the loan proceeds and the collateral that was going to be bought. Had it not been for the security interest in the horses given to the Bank, McCoy's loan application would not have been approved.

In the case at bar, there is also no question that the creditor justifiably relied on McCoy's representations and that they suffered a loss as a result. McCoy stated that he was going to use the loan proceeds to purchase horses. Commercial Bank and the loan officer had loaned the debtor money before. Those loans had all been handled and repaid satisfactorily. The Bank did not have any reason to believe that the debtor would not use the loan proceeds to purchase the horses or that he would not pay the loan back in full. When McCoy did not use the loan proceeds to purchase horses, Commercial Bank sustained the loss of their security. The proceeds of the loan were gone and there were no horses to which their security interest could attach. They were a purchase money secured creditor without collateral which is akin to being a sky diver without a parachute.

There is no doubt that McCoy made a material representation on which Commercial Bank relied. There is also no doubt that Commercial Bank sustained loss as a proximate result of this representation. What is less clear in this case is McCoy's intent with regard to the representations he made. McCoy was careful to point out at the trial that he always had the intent to repay the loan. While that intent to repay may have weighed heavily in the case of an unsecured debt, the debt at issue here is a secured one. The loan was made by the Bank for the express purpose of purchasing horses. The Bank was given a security interest in those horses. But for the secured nature of the loan, the Bank would not have loaned McCoy the money. As a result, what is important in the case at bar is not whether or not McCoy intended to repay the loan, but whether or not McCoy intended to use the proceeds to buy horses. If he did not, then he made a material misrepresentation to the Bank about what he was going to use the proceeds for and he made that representation with the intention of deceiving the Bank.

A creditor can present proof of surrounding circumstances from which a Court can infer a dishonest intent. In the case at bar, the debtor stated that a number of unforeseen circumstances occurred which made it impossible to use the loan proceeds to purchase horses. He also stated that he was not aware that any of these circumstances existed at the time of applying for the loan. The most telling piece of evidence which discounts the debtor's alleged innocence is the $622.81 check to Bellsouth which cleared McCoy's checking account on April 20, 1999—some nine days before executing the promissory note. Given the average amount of time a creditor gives a customer to remit a bill once it has been mailed out and given the average time it takes for a check to clear, McCoy

had to have received that $622.81 bill from Bellsouth in early April. He had to have mailed the check to Bellsouth no later than April 15th. That is fifteen days before he applied for and received the $25,000 loan. McCoy testified at the trial that he did not know about the problems with his phone bills at the time of entering into the loan agreement, but that phone bills in the "$300 to $400 range" appeared in the late summer of 1999. The Court can reach no other conclusion but that McCoy was well aware of the problems he was having with his phone bills at the time of making the representations he would use the proceeds for horses.

More evidence of surrounding circumstances which tend to indicate that McCoy never had the intention to use the loan proceeds to buy horses is his payoff of his 1994 Ford F150 on May 27, 1999. The Court is well aware that a vehicle does not have to be lien free in order to trade it in on another vehicle. Why McCoy concluded that he needed to pay off the entire amount owed on the Ford before trading it in on a lease is beyond the Court's understanding. This was not an unforeseen circumstance. It was a deliberate decision by the debtor to use the loan proceeds to best satisfy his wants and desires to drive a brand new Z71 truck.

The third piece of surrounding evidence which indicates that McCoy never intended to use the loan proceeds to buy horses is McCoy's purchase of furniture in early May 1999. McCoy had been divorced since 1998. His ex-wife had taken the furniture at the time of the divorce. Assuming for the sake of argument that the parties did not divorce until December 31, 1998, McCoy had been living without furniture for over five months when he just could not "take it anymore" and used $1800 of the loan proceeds to buy furniture. It is interesting to note that McCoy did not make every effort to acquire some used or less expensive furniture, but that he felt it necessary to go to a furniture store and purchase $1800 worth of new furniture.

The Court is persuaded that the creditor has met its burden of proof in this case that McCoy made the false representation to the bank that he was going to use the loan proceeds to purchase horses and that McCoy made these representations with the intention of deceiving the bank. This was a secured loan. The debtor testified that he was aware of that nature when he entered into the loan agreement. The Court can reach no other conclusion that despite this knowledge, McCoy never had the intent to use the proceeds to buy horses. The evidence conclusively demonstrates that some of the circumstances which McCoy claimed were unforseen actually existed prior to applying for and receiving the loan. McCoy asked this Court to believe that some of these same circumstances were emergency situations that justified using purchase money loan proceeds for other items than what they were given for. If this Court were to accept that $600 phone bills, the purchase of new furniture, and paying off a $10,000 balance on a vehicle were emergency situations, the Court might as well say the grass is blue and the sky is green. And that is a conclusion this Court refuses to make.

### III. ORDER

It is therefore **ORDERED** that the Complaint to Determine Dischargeability is **GRANTED.** Commercial Bank & Trust Company is hereby awarded a non-dischargeable judgment against the Debtor in the amount of $27,232.13.

It is **FURTHER ORDERED** that the attorney for Commercial Bank & Trust is awarded his attorney fees against the

Debtor/Defendant. If the parties cannot reach an agreement regarding the amount, Commercial Bank & Trust's attorney shall file a request for fees with the Court. **IT IS SO ORDERED.**